**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas E. KEANE,**
**Defendant-Appellant.**

No. 74–1979.

United States Court of Appeals,
Seventh Circuit.

Argued May 21, 1975.

Decided Aug. 18, 1975.
Rehearing and Rehearing En Banc
Denied Oct. 20, 1975.

John Powers Crowley, Jerome H. Torshen, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, Asst. U. S. Atty., Gary L. Starkman, James S. Montana, Jr., Philip C. Parenti, and Tyrone C. Fahner, Assts. to U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER and BAUER, Circuit Judges, and EAST,* Senior District Judge.

SPRECHER, Circuit Judge.

This appeal seeks review of the conviction of Thomas E. Keane, former Alderman of Chicago's Thirty-First Ward and Chairman of the City Council's Committee on Finance, for violation of 18 U.S.C. § 1341 (mail fraud)[1] and 18 U.S.C. § 371 (conspiracy).[2]

I

On May 2, 1974, a 21-count indictment was returned against the defendant Keane. The indictment alleged a mail fraud scheme in violation of 18 U.S.C. § 1341 in which Keane would purchase through nominees, in some cases with advance information, tax delinquent properties at the Cook County scavenger sale in 1966; that these properties would be held in various land trusts without disclosure of the beneficiaries; that they would receive favorable treatment, in having certain encumbrances removed, by the City Council and its various committees and subcommittees, without disclosure of Keane's interest in the properties and with Keane voting on matters that favorably affected his interest; that Keane would vote to authorize the acquisition of parcels in areas in which there were properties in which he had an interest and that he used his position and influence to aid in the sale of the properties to various private and governmental interests.

The indictment went on to allege that the outlined scheme defrauded the City of Chicago, its citizens and Keane's fellow aldermen of their right to the "conscientious, loyal, faithful, disinterested and unbiased services, decisions, actions and performance of official duties" by the defendant and their right to have the City's business and its affairs conducted "honestly, impartially, free from deceit, craft, trickery, corruption, fraud, undue influence, dishonesty, conflict of interest, unlawful obstruction and impairments, and in accordance with the

---

* Senior District Judge William G. East of the District of Oregon is sitting by designation.

1. 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Serv-

ice, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 371 provides in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

laws of the State of Illinois and the City of Chicago. . . .' "

The indictment also charged Keane with conspiring with John Hennessey, Sr. [hereinafter Hennessey] and John Hennessey, Jr. [hereinafter Junior], both unindicted coconspirators, to violate the mail fraud statute in violation of 18 U.S.C. § 371.

## A

Although the evidence is in places conflicting, the basic outline of the alleged scheme is sufficiently clear.[3] In early 1965, a list of tax delinquent properties to be sold at Cook County's scavenger sale scheduled for June 1966, pursuant to Ill.Rev.Stat. ch. 120, § 716a, was published. The purpose of this sale was to place property upon which taxes had not been paid for ten years back on the tax rolls by allowing the purchaser at the scavenger sale to obtain title clear of county tax liens by paying only current and the preceding two years' taxes.

In early April 1965, discussions commenced between Hennessey, Nathan Schwartz and the defendant concerning the formation of Alpine Investments to purchase properties at the 1966 scavenger sale for investment purposes.[4] In connection with this venture there was established Chicago Title and Trust land trust No. 53129, into which properties acquired by Alpine were to be placed

and in which all three partners had equal one-third beneficial interests.

In preparation for the 1966 scavenger sale Alpine, the day-to-day operations of which were run by Hennessey, hired Junior, John Babbington and Vincent Schall to research the properties to be sold. Approximately a month prior to the sale, Keane, Hennessey and Junior met in Hennessey's office to discuss the properties on which to bid. The three of them went through some of the Sidwell map books of the City and Keane made pencil comments on the borders of the map such as "No," "check title, taxes, etc.," "If nobody else buys," "O.K." "If cheap," "NG," "Page NG, but only for a song," and "Check Park." According to Hennessey's testimony Keane said that they should buy all the lots they could in the 87th and Mackinaw area because the government was going to construct a big project there.

Prior to the sale, the three partners, each of whom had invested approximately $100,000, arranged for a $300,000 loan at LaSalle National Bank to purchase scavenger sale properties, assuring the bank that it would be paid out of proceeds from the sale of lots acquired. When the loan was eventually called it was paid by a $275,000 loan from the Jefferson State Bank arranged by Keane.

The scavenger sale began on June 6, 1966, and lasted for about five weeks.

---

**3.** Part I is by no means a complete summary of all the facts. More detailed recitals of the evidence, where necessary, are reserved for later parts in considering defendant's arguments on this appeal.

**4.** This was not the first time that Hennessey and Keane had become business partners. In 1947, two years after he had become an alderman, Keane entered into a business venture with Hennessey to purchase special assessment bonds.

Eventually this enterprise gave way to other business ventures between the two, including the formation in 1963 of THAK Investments to purchase special assessment bonds and vacant tax delinquent lots. THAK properties were placed in Illinois State Bank land trust No. 139 of which Keane and Hennessey were equal beneficiaries. According to Hennessey, he

stopped purchasing properties for THAK in his own name at Keane's suggestion, because Keane was concerned that too many people knew that there were partners.

In addition, prior to the formation of THAK but with a similar purpose, there was created Wabash Investments. The equal partners in this venture were Hennessey, Nathan Schwartz and Adeline Keane, the defendant's wife. The government claimed that Mrs. Keane took no active part in this venture and served merely as a front for her husband's investment. The defendant introduced evidence attempting to show that the funds invested in her name were her own. Properties acquired by Wabash were placed in Illinois State Bank land trust No. 149.

The bulk of the alleged scheme deals with Alpine lots, but in some instances Wabash and THAK lots were involved.

Hennessey participated in the sale for the first week and then left responsibility for Alpine's bidding to Junior and Harry Rubenstein, an attorney for Alpine. Properties were bid for in the name of either John Hennessey, Sr. or Ada Sills, Rubenstein's wife's maiden name. Alpine was the second largest purchaser at the sale, purchasing 1,878 parcels of property at a total cost of $208,543.

B

In order to obtain clear title after the statutory two year period of redemption ran,[5] it was necessary for Alpine to remove the special assessment liens against each parcel. Special assessments are a means of financing local improvements such as alleys, sewers, streets and other improvements which benefit the adjacent properties. Special assessment bonds are issued to the contractor evidencing his right to payment for the work performed. Bondholders[6] are paid from the special assessment fund established to receive the payments from the private property owners and used to pay the principal and interest on special assessment bonds. According to the testimony at the trial no City funds are contributed to this fund, but the fund does pay to the City's general corporate fund up to five percent of the original assessment, presumably to cover administration expenses.

Bondholders, although having no direct action against the City, in the event of default may recover on the bonds by an action against the property. In order to remove the lien of the special assessment bondholders on the parcels it purchased, it was necessary for the Alpine partners,[7] in the name of the land trust that held the property, to cause foreclosure proceedings to be instituted. In cases where there were outstanding bondholders this was accomplished by filing a "Request for Foreclosure of Special Assessment Liens." For properties in Chicago, this application is forwarded to the staff of the Subcommittee on Special Assessments, a subcommittee of the Committee on Finance of the City Council, so that the Subcommittee can set a minimum bid to be made by the applicant at the subsequent foreclosure proceeding, commenced by the City of Chicago in the Circuit Court of Cook County. Although the judge could reject the minimum bid as inadequate or the bondholders could actually participate in the foreclosure sale thereby bidding the price up, in practice the minimum bid set by the Subcommittee invariably ended up as the purchase price. The money received from the sale is paid to the County Collector and transmitted through the special assessment fund to the bondholders.

At all times relevant to this case the chairman of the Subcommittee on Special Assessments was Alderman Fifielski, who was appointed to the position by Keane. There was testimony that Hennessey met Fifielski in Keane's outer office at City Hall and said "Alderman, we have some special assessments we would like to have foreclosures on. Would you call a meeting?" Fifielski subsequently held a meeting on June 26, 1970.

The evidence clearly showed that prior to this meeting Fifielski had set minimum bids for foreclosures at 30 to 60 percent of the principal amount due on the special assessment bonds. At the

---

5. Alpine received a certificate of purchase for each parcel purchased, subject to the original owners right of redemption at any time up to two years from the date of the scavenger sale by paying the bid price plus statutory interest. Approximately 300 to 400 properties purchased by Alpine at the scavenger sale were redeemed.

6. Generally the contractors discount these bonds to lenders or investors, thus receiving immediate payment for their work without waiting for the various installments to fall due.

7. Properties owned by THAK and Wabash were also subject to liens of special assessment bondholders and with respect to the removal of such liens, and the charges in the indictment relating to such removal, are considered in the same light as Alpine properties.

June 26, 1970 meeting of the Subcommittee, almost all of the 32 parcels of property in which the defendant had an interest were assigned minimum bids of approximately 10 percent.

The other procedure followed by the Alpine investors to obtain title clear of special assessment liens was "Compromise Offers in Lieu of Foreclosures." In the early 1930's the special assessment fund had redeemed a substantial number of bonds. Thus, some of the parcels in which the defendant had an interest were subject to liens for which there were no bonds outstanding. In this situation a property owner in order to clear the lien is required to settle the claim of the special assessment fund by making payment to it. If the comptroller, to whom application is made, determines that there are no outstanding bondholders, a compromise offer based on a standard formula is transmitted to the Subcommittee on Special Assessments. The compromise figure was always equal to "sales and costs" which Alderman Fifielski testified was the amount that the special assessment fund paid when it originally redeemed the outstanding bonds.[8]

In both the case of "Requests for Foreclosures of Special Assessment Liens" and "Compromise Offers in Lieu of Foreclosures," the Subcommittee reports, with its recommendations, were inserted in the report of the Finance Committee, which at all times relevant to this case would be introduced to the full City Council by the defendant. After introduction of such reports, if there was no objection or debate desired, the matter would be referred to the omnibus bill and be voted on at the end of the day along with other matters.[9] On numerous occasions the defendant Keane voted in favor of omnibus bills containing "Requests for Foreclosures" and "Compromise Offers in Lieu of Foreclosure" proposals relating to properties in which he had an interest.[10] Keane never disclosed his interest in these properties to his fellow aldermen.

At trial the government called a number of aldermen, who testified that they would have voted against the proposals if they had known of Keane's interest or would have demanded further investigation and debate on the matter. The defense produced a number of aldermen who testified that they would have voted the same way, even if they had known of Keane's interest, assuming the properties in which he had an interest were accorded the same treatment as those in which he had no interest.

## C

The final phase of the allegedly fraudulent scheme dealt with the disposition of Alpine and other properties owned by various land trusts, in which the defendant Keane had an equitable interest as

---

**8.** The government attempted to show that Alpine properties and other properties in which Keane had an interest received compromise offers that were lower than the total amounts due considering the original principal and accrued interest on the special assessment warrants originally issued. The defendants introduced evidence that showed that all properties were treated equally, and that it was the "sales and costs" figure that was significant in determining the compromise offers set. There does not appear to be a reasonable basis from the exhibits introduced upon which to conclude that properties in which Keane had an interest received any more favorable treatment than other properties that were handled through the "Compromise Offer in Lieu of Foreclosure" procedure.

**9.** The omnibus bill usually contains fairly perfunctory matters and is generally passed by a unanimous vote. The procedures of the City Council provide that if any alderman objects to an item being voted upon in the omnibus, then debate and a roll call vote should be held. Additionally, any matter may be referred back to committee or be reconsidered at the next council meeting.

**10.** In all, 121 Alpine, Wabash and THAK lots received City Council approval for foreclosure requests on 17 separate dates. Keane introduced and voted favorably upon such motions on all 17 dates. Likewise, 122 Alpine, Wabash and THAK lots received City Council approval for compromise offers in lieu of foreclosure on 24 separate dates. Keane introduced and voted favorably upon these motions on each occasion.

beneficiary. The indictment alleged that Keane used undue influence and inside information in relation to the disposition of some of the properties.

The undue influence charge is based on transactions with three governmental agencies. In May 1968, Keane voted in the City Council to authorize the Chicago Housing Authority (C.H.A.) to acquire properties located in the Englewood, Woodlawn and Lawndale areas of Chicago, notwithstanding the fact that Alpine had an interest in properties in these areas. Hennessey testified that he was with Keane during the summer of 1968 when Keane called Charles Swibel, Chairman of the C.H.A. and said "Charlie, this is Tom Keane. John Hennessey and I own some lots. We would like to have you buy some of them." Hennessey, on Keane's instructions, went to see Swibel.[11] Keane denied ever requesting Swibel to purchase any lots. Eventually approximately 60 parcels were sold to C.H.A.

Five parcels in which Keane had an interest were sold to the Chicago Dwelling Association (C.D.A.). C.D.A. is a non-profit corporation for which the C.H.A. acts as a purchasing agent.

In the spring of 1968, Hennessey gave Gerald Broderick, a C.D.A. attorney, a long list of properties that he had available. Initially Hennessey was informed that the C.D.A. could not buy the lots because of improper zoning. On July 23, 1968, pursuant to instructions from Ira Bach, C.D.A. Executive Director, Broderick sent a letter to Robert Snow, the individual in charge of C.H.A. land acquisition, requesting C.H.A. to purchase some lots located on or near Watkins Avenue and stating that Bach had informed him (Broderick) that Swibel wanted the lots purchased "as swiftly as possible." This letter was written during the same summer that Keane had asked Swibel to purchased some of Al-

pine's lots. Broderick received a letter from Snow dated July 26, 1968, stating that the subject properties were not in an area designated by the City Council,[12] and that the zoning was not suitable for C.H.A. needs and was not likely to be rezoned. Snow suggested C.D.A. use its own funds for acquiring the properties. After receiving this letter Broderick sent a memorandum to James Phillips, his immediate supervisor, restating the same problems raised in Snow's letter and also indicating that the "per unit land cost is over twice what we normally pay." Notwithstanding these problems, the five Watkins Avenue lots were acquired by C.D.A. in September 1968.

The final transaction in which the government alleges undue influence involved sales to the Metropolitan Sanitary District (M.S.D.). M.S.D. threatened condemnation of 102 lots in which the defendant had an interest and offered to purchase them for $150 per lot. Thereafter, a meeting was held with Robert Wiss, an attorney representing M.S.D., Harry Rubenstein, attorney for Alpine, Hennessey and Keane. During the meeting Wiss indicated that the top appraisal was $700 per lot. Ultimately the lots were purchased by M.S.D for approximately $775 per lot.

The primary transaction on which the government predicates its use-of-inside-information charge (as opposed to the undue-influence sales) is the sale of three lots to the Chicago Department of Urban Renewal (D.U.R.) in the 87th and Mackinaw area. As previously stated Keane had told Hennessey to acquire as much property as possible in this area because a big government project was going up.

In August 1966, after the scavenger sale, the City made its first definitive public move by requesting $129,000 in federal funds under the Neighborhood

---

11. Hennessey testified that Swibel treated him in a curt manner.

12. When the C.H.A. expended funds for acquisition of properties for C.D.A., it was subject to the restriction that it only purchase property in areas previously approved by the City Council.

Development Program [13] to undertake a study to determine whether the area would qualify as an urban renewal project. Previously, there had been a great deal of public discussion concerning this area. In January 1967, the City Council with Keane voting in the affirmative, notwithstanding his interest in approximately 30 parcels in the area, designated the area "slum and blighted" and thereby authorized the D.U.R. to begin acquiring properties in the area. After a series of negotiations [14] the D.U.R. eventually acquired three lots in which the defendant had an interest.

The other transaction which the government states represents the use of inside information is the sale of Alpine and THAK lots to the Chicago Park District. In February of 1970, Keane gave Hennessey a copy of a "Chicago Park District inter-office correspondence" which Keane said had been given to him by Alderman Fitzpatrick, chairman of the City Council Committee on Buildings and Zoning. The correspondence indicated that the Park District would condemn various properties owned by Alpine and THAK. Two years later, the lots specified in the inter-office correspondence were acquired by the Park District.

In addition to public agencies there were sales to private parties as well. National Homes Corporation eventually acquired 75 lots after extensive negotiations with Keane and other Alpine partners and employees. United States Steel acquired five lots in the 87th and Mackinaw area not wanted by D.U.R. for $12,-500. Keane was referred to United States Steel by Lewis Hill and after contacting an old friend there, he was referred to the appropriate officers.

The government introduced evidence at trial that on the parcels sold to M.S.D., D.U.R., C.H.A., C.D.A., Chicago Park District and National Homes Corporation, there was a gross profit of $167,471.30.[15] On cross-examination it

---

13. Under this program the federal government provides two-thirds and the City provides one-third of the funds.

14. The government introduced detailed evidence concerning these negotiations. According to the evidence certain large portions of the area were slated for early acquisition. Earl L. Neal, Special Assistant Corporation Counsel in late 1968, arranged for appraisals on parcels in these areas and began the preliminary steps for condemnation proceedings. Subsequent to this in January 1969, Keane inquired of Lewis Hill, Commissioner of D.U.R., allegedly for, a friend and without disclosing his own interest in the properties, whether D.U.R. would allow improvement of lots by property owners in the project area. Hennessey testified that Keane told him to write and send a list of the properties that they owned in the area to Hill. Hennessey sent such a list indicating that he owned the properties. Hill recognized the properties as the ones which Keane had referred to in their previous discussions.

Upon receipt of their letter, Hill instructed Walter Sroka, director of land acquisition for D.U.R., to obtain appraisals in the properties listed, notwithstanding the fact that many of them were outside the areas marked for first acquisition, "because the owner has requested that we proceed to acquire as quickly as possible." The appraisals were ordered. Finally, on July 14, 1969, Neal sent three form letters to Hennessey offering to acquire three parcels in the primary acquisition area. These three lots were the only ones purchased, although at one point Hill indicated to Keane that five additional parcels might be purchased, but because of a lack of federal funds they were not.

At one point the government argues that Keane used his influence with Hill to get these lots purchased. This might be a reasonable conclusion from the evidence in the above paragraph, but seems slightly inconsistent in view of Keane's effort to keep his interest undisclosed from Hill. It is possible, however, that Keane was putting pressure on Hill to buy the properties, notwithstanding the fact that Keane did not want Hill to know who was the beneficiary of his efforts.

15. For some reason this figure does not include the sales to United States Steel. The government figures showed the profits broken down as follows:

| Purchaser | Profit On Sale | Parcels Sold |
| --- | --- | --- |
| Metropolitan Sanitary District | $ 55,954.82 | 102 |
| Department of Urban Renewal | 7,658.17 | 3 |
| Chicago Housing Authority | 53,893.90 | 58 |
| National Homes Corporation | 32,170.85 | 45 |
| Chicago Dwellings Association (THAK) | 1,119.64 | 5 |
| Chicago Park District (THAK and Alpine) | 16,673.92 | 5 |
| TOTALS | $167,471.30 | 218 |

was determined that this figure did not include expenses to Alpine and THAK such as taxes, overhead and sales commissions to Junior. The defendant introduced evidence that Keane had a net loss of $26,032.07 for all transactions involving THAK and Alpine properties.

Keane was found guilty by a jury of conspiracy and 17 counts of mail fraud. From this conviction the defendant appeals, citing four principal matters that he contends require reversal: (1) the evidence adduced at trial was insufficient as a matter of law to constitute a fraudulent scheme; (2) assuming the existence of a fraudulent scheme, the mailings were not in furtherance of that scheme; (3) the Illinois State statutes read to the jury were inapplicable to the facts of this case; and (4) the district judge made erroneous rulings on evidentiary and other trial matters.

## II

The government alleged and introduced evidence of a fraudulent scheme involving the defendant with respect to three general areas. First, the government contends that it was improper for Keane to acquire properties at the 1966 scavenger sale, in some instances using inside information. Second, that it was improper for Keane to vote on matters in the City Council affecting land in which he had an interest without disclosing that interest, and in the case of "Requests for Foreclosures" to receive preferential treatment. And finally, it was improper that the defendant use the influence of his office for his own personal benefit in the disposition of properties in which he had an interest, and that he sell parcels that he had acquired through the aid of inside information.

The defendant, on the other hand, contends that there was no fraudulent scheme, that it was not improper for Keane to acquire parcels at the 1966 scavenger sale, that his actions in the City Council were pro forma votes on matters in which the City of Chicago had no interest, and finally that there was inadequate proof with respect to the undue influence and the advance information charge.

In some respects we agree with the defendant's position insofar as he suggests that certain actions to which the government attempts to attribute criminality were either not by themselves criminal or not supported by sufficient evidence to draw the inferences the government wishes us to draw. This does not mean, however, that in viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), there was insufficient proof to establish an overall scheme violative of the mail fraud statute. It is not necessary for all aspects of an alleged scheme to be illegal in their separate parts, but rather only that the scheme viewed as a whole involve fraudulent conduct. *Holmes v. United States,* 134 F.2d 125 (8th Cir.), *cert. denied,* 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943); *United States v. Brandom,* 273 F.Supp. 253 (E.D.Wis.1967).

The purpose of the mail fraud statute is to prevent the post office from being used to carry schemes to defraud into effect. *Parr v. United States,* 363 U.S. 370, 389, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). The two necessary elements for violation of the mail fraud statute are formation of a scheme with intent to defraud and the use of mails in furtherance of that scheme. *United States v. Shavin,* 287 F.2d 647, 649–50 (7th Cir. 1961). The statute includes a broad proscription of behavior for the purpose of protecting society. *United States v. Owen,* 231 F.2d 831 (7th Cir.), *cert. denied,* 352 U.S. 843, 77 S.Ct. 42, 1 L.Ed.2d 59 (1956). A specific violation of state law, although covered by the statute, *United States v. Flaxman,* 495 F.2d 344, 349 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974), is not necessary to obtain a conviction for mail fraud. *United States v. States,* 488 F.2d 761, 767 (8th Cir. 1973), *cert. denied,* 417 U.S. 909 and 950, 94 S.Ct. 2605, 41

L.Ed.2d 212 (1974); *United States v. Edwards,* 458 F.2d 875, 880 (5th Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972). Rather the "[l]aw puts its imprimatur on . . . accepted moral standards and condemns conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Blachly v. United States,* 380 F.2d 665, 671 (5th Cir. 1967). Neither the ultimate success of the fraud nor the actual defrauding of a victim is crucial to a successful prosecution. *United States v. Reicin,* 497 F.2d 563, 571 (7th Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *United States v. George,* 477 F.2d 508, 512 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973); *Shavin, supra* at 651–52.

With these basic principles in mind we turn separately to each of the three fundamental aspects of the scheme.

### A

■ With respect to the acquisition of properties at the county scavenger sale, we believe that it was clearly improper and therefore actionable under the mail fraud statute for the defendant to make use of inside advance information obtained by virtue of his official position for his own personal gain. *See, e. g., United States v. Peltz,* 433 F.2d 48, 52 (2d Cir. 1970), *cert. denied,* 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971); *United States v. Groves,* 122 F.2d 87, 90 (2d Cir.), *cert. denied,* 314 U.S. 670, 62 S.Ct. 135, 86 L.Ed. 536 (1941); *United States v. Buckner,* 108 F.2d 921, 926 (2d Cir.), *cert. denied,* 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940).

In *United States v. Buckner* where the defendants were in a fiduciary position with a group of bondholders, the court said: "[u]sing a fiduciary position . . to obtain secret profits based upon inside information is not only a breach of trust, but an active fraud on the bondholders." *Buckner, supra* at 926. Similarly, in *United States v. Groves* the court said in

reference to corporate officers that "there was certainly the use by a fiduciary of inside information to his own benefit and to the detriment of his cestui, which, when involving use of the mails, we have recently held to be within contemplation of the mail fraud statute." *Groves, supra* at 90. Finally in *United States v. Peltz,* where a conspiracy to defraud was involved and the defendant was charged with receiving advance inside information from an employee of the S.E.C., the court said: "[p]ublic confidence essential to the effective functioning of government would be seriously impaired by any arrangement that would enable a few individuals to profit from advance knowledge of governmental action." *Peltz, supra* at 52.

■ These cases taken together show that advance dissemination and use of governmental information by a few individuals impairs the functioning of government and that when the use is made by a public official it amounts to a breach of a fiduciary duty which is clearly actionable under the mail fraud statute. *Post v. United States,* 132 U.S.App. D.C. 189, 407 F.2d 319, 329 (1968), *cert. denied,* 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969); *United States v. Dorfman,* 335 F.Supp. 675, 679 (S.D.N.Y. 1971), *aff'd,* 470 F.2d 246 (2d Cir. 1972), *cert. dismissed,* 411 U.S. 923, 93 S.Ct. 1561, 36 L.Ed.2d 317 (1973); *United States v. Hoffa,* 205 F.Supp. 710, 716 (S.D.Fla.), *cert. denied,* 371 U.S. 892, 83 S.Ct. 188, 9 L.Ed.2d 125 (1962).

With respect to the acquisition of a significant number of parcels in the 87th and Mackinaw area, the evidence in its form most favorable to the government showed that while discussing what properties to acquire at the scavenger sale, Keane told Hennessey to buy in this area because a "big government project" was going up. Subsequently, 30 parcels in this area were purchased.

Although the defense introduced evidence to show that discussions concerning urban renewal in this area had been going on for a decade, the government introduced evidence that it was not until

August 21, 1966 (after the scavenger sale), that an announcement was made to the public that the area had definitely been designated to undergo study to see if it qualified for urban renewal. Thereafter, the area was designated by the City Council, with Keane voting in the affirmative, as "slum and blighted" and the D.U.R. began acquiring land in the area including three lots in which the defendant had an interest.

Although the evidence is not overwhelming on the use of advance information charge, and it is possible to interpret the evidence as representing shrewd business judgment on Keane's part, we cannot say that the jury was not entitled to believe that Keane made use of advance information to acquire substantial amounts of property in an area prior to the public announcement indicating that the area was being considered for urban renewal. This use of advance information by a public official as we have said violates the mail fraud statute.

### B

The next aspect of the charged fraudulent scheme involved Keane's participation in official City Council proceedings, without disclosure, on matters in which he had a financial interest. It is clear to us that one who breaches the public trust by actively concealing a personal financial interest from the public and from a public body charged with the responsibility of passing judgment on matters directly affecting that financial interest, and on which he serves and in which he participates in the formulation of the collective judgment of that body, pursuant to his official duties, may be prosecuted for mail fraud. Cf. United States v. Barrett, 505 F.2d 1091, (7th Cir. 1974), cert. denied, 421 U.S. 964, 95

S.Ct. 1951, 44 L.Ed.2d 450 (1975); United States v. Isaacs, 493 F.2d 1124 (7th Cir.), cert. denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).

As this court said in United States v. Isaacs, where a former Illinois governor was prosecuted for accepting bribes given in an effort to obtain more favorable racing dates "[t]he citizens of Illinois were defrauded of Kerner's honest and faithful service as governor," notwithstanding the fact that no actual pecuniary loss to the State of Illinois was shown. Isaacs, supra at 1150. Similarly, in United States v. Barrett, where the Cook County Clerk was found guilty of accepting money from a voting machine manufacturer for purchasing the City's voting machines from the company, and where the insurance on those machines was placed through an agency that received 25 percent of the premiums paid by Cook County to the insurance carrier and passed on 15 percent of that amount to the defendant, the court quoted approvingly the language of the Isaacs decision finding a scheme that defrauds the public out of the honest and faithful services of a public official cognizable under the mail fraud statute. Barrett, supra at 1104.[16] Finally, in Shushan v. United States, 117 F.2d 110 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531 (1941), an indictment was sustained that alleged that a member of a public board used his influence to obtain approval for refunding bonds for a percentage of the profit without disclosing this interest, and that by reason of the secret interest of the board member the "Board was . . . deprived of [the] fair judgment of one of its members, who assiduously and corruptly influenced and persuaded the other members . . . ." Id. at 115.[17]

---

16. See also United States v. Faser, 303 F.Supp. 380 (E.D.La.1969), where the court said "[t]hat it is a violation of the statute in question [mail fraud] if a person defrauds the State out of the 'loyal and faithful services of an employee.'" Id. at 384.

17. Much of the language in Shushan is applicable to the facts of this case.

[Defendant] had been a member of the Board for seven years, and was Chairman of the Finance Committee, apparently without other members on it. He was a lawyer, and his advice and opinion had weight with the Board. In the adoption of this contract, and in the several refundings under it, according to the stenographic reports of the meetings, he did most of the questioning and arguing

With respect to "Requests for Foreclosures of Special Assessment Liens," as we stated in Part I B *supra*, prior to the June 26, 1970 subcommittee meeting, Alderman Fifielski had set minimum bids at 30 to 60 percent of the principal due on the outstanding special assessment bonds. At that meeting when 32 parcels of property in which the defendant had an interest were acted on, Fifielski set minimum bids of 10 percent.

The defendants attempted to show through the testimony of Fifielski and the introduction of exhibits that subsequent to the June 26 meeting, low bids around 10 percent would be set if the application presented to the subcommittee did not have a proposed minimum bid, and that if it did, the amount of the proposed minimum, assuming it was greater than 10 percent, would be set. The evidence clearly showed, however, that this purported pattern was not followed consistently after the June 26 meeting. Defendant's own exhibit showed that four parcels considered at the October 13, 1970 meeting of the Subcommittee had minimum bids of 59.6 percent notwithstanding the fact that no proposed minimum was included by the applicant.[18] Also inconsistent with the defendant's explanation is the Subcommittee's meeting of January 21, 1971, for which the defense did not prepare a summary, although it prepared summaries for earlier and later meetings. Government counsel pointed to a number of parcels handled on that date for which no proposed bids were submitted by the applicant, but for which percentages were set well above 10 percent.[19]

Even if it were true that Alderman Fifielski, starting with the June 26, 1970 meeting, changed his policy with respect to minimum bids, it is quite clear that as of that date properties in which Keane had an interest received a lower percentage than applications submitted by others up to that time. Whether such a new policy was justified, perhaps under normal circumstances would be left to the judgment of the chairmen of the Special Assessment Subcommittee and the Finance Committee. This, however, should not have been the case when the new policy was to begin on a day when properties in which the chairman of the Finance Committee had an interest were to be considered. As of that date numerous aldermen testified that they would have considered in more detail the foreclosure requests which they approved had they known of Keane's interest. In any event there was sufficient testimony to show that the 10 percent policy was not consistently applied after the June 26 meeting, and from which the jury could believe that Keane introduced and voted on proposals granting properties in which he had an interest special treatment.

With respect to "Compromise Offers in Lieu of Foreclosures," the evidence was weak that properties in which the defendant had an interest received more favorable treatment than property be-

with Newman and Harris, *made most if not all of the motions to accede to their proposals, and voted for them. The votes were always unanimous. No other member of the Board knew or suspected his interest in the matter.* He says he concealed it lest it might influence them to be more favorable. *We think the jury could well conclude that in his position his conduct was so irreconcilable with public duty and private morality that neither he nor anyone privy to it could intend fairness and honesty.*
*Shushan, supra* at 120 (emphasis added).

18. Alderman Fifielski testified that these exceptions to the purported post-June 26 rule may have been caused by his accepting the recommendations of the Subcommittee's staff, rather than calculating 10 percent of the principal amount due. He said he may have done this because he may have been in a hurry.

19. The defendant points out that when Harry Rubenstein took over the preparation of Alpine's applications for foreclosures he did insert bids on the applications and while some other properties without such bids in which the defendant had no interest were getting 10 percent treatment, the Alpine properties were receiving substantially higher percentages. The fact that not all properties of Alpine received the favored 10 percent treatment, of course, does not mean that on June 26, 1970 they were not receiving favored treatment.

longing to other members of the public.[20] Regardless of this fact it still remains true that the defendant as Finance Committee Chairman introduced proposals with respect to properties in which he had an interest and thereafter voted on them without disclosing his interest. Keane owed a duty to the other aldermen to disclose his interest so that they could consider the propriety of compromising a lien of the City's special assessment fund in favor of a City alderman. The fact that his properties may have received treatment which was the same as all other members of the public, and that he would have in all probability received this compromise offer even if he had disclosed his interest, does not change the fact that he did receive a benefit from the City Council's action without ever informing his colleagues of his interest.

The defendant contends that with respect to "Compromise Offers in Lieu of Foreclosures" the most the government has shown was a failure to disclose a personal pecuniary interest in matters presented before the City Council, and that this amounts to no more than constructive fraud, which is not actionable under the mail fraud statute. *Epstein v. United States,* 174 F.2d 754 (6th Cir. 1949).[21] In *Epstein* the defendants, who were officers of brewing corporations, were charged with buying supplies from another company in which they had a financial interest at excessive prices. The court first held that there was insufficient proof that an excessive price was charged and that there was a fatal variance between the indictment and the subsequently adopted government theory that defendant's failure to disclose their interest in the supply companies to their respective boards of directors was sufficient to constitute the fraud. *Id.* at 763. The court also stated that the receipt of money from another corporation by a director "without disclosure of interest to the board of directors does not constitute the perpetration of an active, intentional fraud upon his corporation where there is good faith, fair dealing, and benefit to the corporation of which he is a director." *Id.* at 765.[22]

We do not believe that *Epstein* necessarily requires a holding that properties treated by the "Compromise Offer in Lieu of Foreclosure" procedure were not the subject of a fraudulent scheme. We note first that this court has recently distinguished the *Epstein* case. In *United States v. George,* 477 F.2d 508 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973), the rationale of *Epstein* was not applied to a situation where the defendant, a buyer for Zenith did not disclose to that company that he was receiving a kickback from companies from which he purchased supplies for Zenith. The court after noting that the *George* defendant, unlike the *Epstein* de-

---

**20.** See note 8, *supra.*

**21.** Defendant's constructive fraud argument based on *Epstein* is clearly inapplicable to those properties which were subject to the "Request for Foreclosure" proceedings. As we have said with respect to that procedure there can be no question that defendant's properties were treated preferentially, and thus, Keane who was in a fiduciary position was voting to approve minimum bids applicable to his properties, while at the same time the City Council did not see fit to grant similar percentages to properties belonging to other members of the public.

**22.** Notwithstanding the fact that the court made a finding of fatal variance between the indictment and the evidence and that it indicated there was only minimal evidence of the defendant's interest in the supply companies, *Epstein, supra* at 769, the case is still cited for the proposition that a mere failure to disclose is insufficient to be cognizable under the mail fraud statute.

In addition to the statement quoted in the text the court after restating that the transactions involved were fair to the defendants' corporations stated:

Certainly, a mere disclosure of interest could not convert an actual fraud with a wrongful purpose to injure or deceive, into an honest, moral transaction with a purpose to benefit. It is this consideration that serves as a criterion for distinguishing cases cited by the government to sustain its contention that lack of disclosure of interest—or secret profits, as the government terms it—proves actual fraud in this case.

*Id.* at 768.

fendant, was required to turn over his secret profit to the employer he defrauded, went on to state that non-disclosure in *George* was essential to the fraudulent scheme.[23] While the comparison between *George*, and *Epstein* and the present case is difficult, because of the factual distinctions with respect to profit, we believe that the cases are not inconsistent with our conclusion that Keane's conduct with respect to "Compromise Offers in Lieu of Foreclosures" was violative of the mail fraud statute.[24]

This case, unlike *Epstein*, involves a public official. In recent years the mail fraud statute in this circuit has been used increasingly with approval to prosecute public officials for violating the public trust and in effect depriving their constituents of their right to loyal, faithful and honest public service. *Barrett, supra; United States v. Staszcuk,* 502 F.2d 875 (7th Cir. 1974), *rev'd in part on rehr'ing,* 517 F.2d 53 (7th Cir. 1975), *petition for cert. filed,* 43 U.S.L.W. 3675 (U.S. June 24, 1975); *Issacs, supra.* In the factual circumstances of this case Keane's failure to disclose to his fellow aldermen his interest in matters pending before the City Council coupled with his other actions amounted to "conduct which fails to match the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Blachly, supra* at 671. In addition this case involves more than "mere" non-disclosure. The evidence showed that Keane and his co-conspirators actively attempted to conceal the defendant's interest by the use of nomi-

nees when purchasing property, and by the use of land trusts to hold the acquired parcels.[25] It is also obvious that disclosure of Keane's interest in properties subject to "Compromise Offer in Lieu of Foreclosure" procedures could have well led to discovery of Keane's interest in properties subject to "Request for Foreclosure" procedures, which were clearly getting favored treatment. The defendant's failure to disclose his interest affirmatively misled his fellow aldermen and the alleged scheme was of such a nature that it "depended for [its] success upon concealment and deception and could not conceivably [have] be[en] carried out by the guilty [party] without covering up the true facts." *Epstein, supra* at 767.

Finally, defendant contends that the City's involvement in both procedures for clearing special assessment liens is minimal. He argues that in cases of "Requests for Foreclosures" only a minimum bid was set by the City Council, that this had to be subsequently approved by a court, and that the bondholders although receiving their payments from the special assessment fund, had no claim against the City for any unpaid amount on the bonds. In effect what the defendant asks us to hold is that the City Council's action in approving "Requests for Foreclosures" had no effect and served no purpose—that the action by the Council was entirely superfluous. We refuse to so hold.

While it may be true that with respect to sophisticated bondholders who generally made private deals with owners who were seeking foreclosure so that the

---

**23.** The court in *George* said:

There was no reason to believe disclosure by the defendants in *Epstein* would have, under the particular circumstances there, made any bargaining difference to the breweries, but Yonan's [*George* defendant] disclosure, in addition to making the scheme impossible, would have enabled Zenith to realize a substantial discount.

*George, supra* at 513 n. 5.

**24.** For other cases where the failure to disclose has been considered actionable under the

mail fraud statute see generally *United States v. Simon,* 425 F.2d 796, 806–08 (2d Cir. 1969), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970); *United States v. Miller,* 210 F.Supp. 716 (S.D.Tex.1962).

**25.** The use of nominees and land trusts are not in and of themselves illegal but must be viewed within the total factual context involved. *Holmes v. United States,* 134 F.2d 125 (8th Cir.), *cert. denied,* 319 U.S. 776, 63 S.Ct. 1434, 87 L.Ed. 1722 (1943).

**550**

amount of the minimum bid set by the Council made no difference,[26] there are situations in which unsophisticated, non-professional individuals hold the special assessment bonds.[27] These individuals especially, as well as professional bond-holders, had the right to rely on the City Council to perform its function of setting a fair bid, one that reflected the fact that these bonds were not worth full value because of the long time they had been in default, but one that reflected the fact that they were still of some value. In this regard the City Council was to act as an arbiter by setting a minimally fair price,[28] a proposition that with respect to properties in which Keane had an interest, was not always true.

With respect to "Compromise Offers in Lieu of Foreclosures" we disagree with the defendant's contention that the City Council's action amounted to a nullity and that the City had no interest in these matters. "Compromise Offers in Lieu of Foreclosures" came about because the City, through the special assessment fund, during the depression, retired special assessment bonds. The defendant would have us believe that it made no difference whether the Fund ever received back any of the monies expended. This contention is belied by the fact that there existed a procedure to effect compromise offers for repayment to the Fund. While it is not clear how these funds are or will be used in the future, we cannot say that the City has no interest in using them again as it

did in the depression or in some other manner.

We therefore reject the defendant's claim, made with respect to both "Compromise Offers in Lieu of Foreclosures" and "Requests for Foreclosures," that these were pro forma matters in which the City had no interest and the voting on which, even without the disclosure of defendant's interest, did not constitute fraudulent conduct. The fact that normally these were perfunctory matters left to the Subcommittee on Special Assessments and the Committee on Finance to handle because of their expertise and were routinely approved, is all the more reason why Keane should have disclosed his interest. Involved in this case were not votes on major policy issues, where even if disclosure of a personal interest was not made, there still would have been serious consideration given to the merits of a proposal by public officials. Instead we have a situation where other aldermen relied on the expertise and presumably the objectivity of Keane's committee and the Special Assessment Subcommittee. Had they known that this objectivity did not exist, they would, as some testified, have requested further information and study regarding the proposals. It was this right to the defendant's faithful service and the right to be apprised of material circumstances with regard to the special assessment foreclosures and compromises upon which they voted, that Keane's colleagues, and through them the public, were defrauded.

---

**26.** Generally what occurs is that once the minimum is set the bondholder meets with the property owner and through negotiations agree on an amount in addition to the bondholder's share of the minimum bid. The bondholder accepts the settlement figure in exchange for not bidding at the foreclosure sale. At what dollar level the negotiations begin depends on the minimum bid, but otherwise that amount is irrelevant.

**27.** The defendant contends that there was no proof that any bondholder did not settle, and the government argues that there was no showing that all bondholders did settle. We consider this point irrelevant. Whether individuals sought to reach private settlements or not does not change the fact that the City

Council had devised a plan which seemingly offered some protection to members of the public. The defendant Keane through his actions sought to subvert that plan. If all bondholders did indeed settle, his scheme did not meet with success, but success of a fraudulent scheme is not required by the cases for a mail fraud conviction. *United States v. Shavin*, 287 F.2d 647, 651–52 (7th Cir. 1961).

**28.** The defendant argues that these minimum bids were subject to court approval. It is undisputed, however, that except in very few cases, the amount ultimately set by the court was the minimum bid approved by the Council.

C

The final part of the alleged scheme was the disposition of the properties. In relation to this aspect of the scheme the government charged the use of advance information, which we considered in Part II A, *supra,* and the use of undue influence by the defendant. With respect to the use of undue influence the government offered evidence detailing the sale of properties to the C.H.A. and C.D.A. through Charles Swibel and the sale to M.S.D. *See* Part I C, *supra.*

We have no doubts that use by a public official of his position and influence to obtain personal benefits can, under appropriate circumstances, constitute a fraudulent scheme in violation of the mail fraud statute. *Bradford v. United States,* 129 F.2d 274 (5th Cir.), *cert. denied,* 317 U.S. 683, 63 S.Ct. 205, 87 L.Ed. 547 (1942). Such conduct falls within the type condemned by *United States v. Blachly, supra* at 671. We have reviewed carefully the record in this case and we believe that with respect to the sale and attempted sale of certain properties to C.D.A., the evidence was sufficient for the jury to believe that Keane used undue influence.

The evidence consisted of Hennessey's testimony that Keane called Swibel and asked him to purchase some of their properties. Despite Swibel's apparent anger at the request, properties were eventually acquired by C.D.A. pursuant to Swibel's desire. These and other properties were acquired or considered for acquisition, according to the evidence, despite the fact they were improperly zoned, were unlikely to be rezoned, were outside a City Council designated area and were significantly more costly than similar properties acquired by C.D.A. From the evidence the jury could reasonably assume that Keane had put pressure on Swibel, and that his conduct was part of a scheme that was violative of the mail fraud statute.[29]

III

The next major argument made by the defendant is that the mailings that are the basis of each count were not in furtherance of the alleged fraudulent scheme.[30]

Although it is not necessary that a scheme contemplate the use of the mails as an essential element, *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954), it is necessary that the alleged mailing be "for the purpose of executing the scheme, as the statute requires." *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). Each mailing that forms a basis for a count must be in furtherance of executing the fraudulent scheme. *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Staszcuk, supra* at 880; *Isaacs, supra* at 1151–52. In addition, it is not necessary to establish a violation of the mail fraud statute that the defendant actually mailed anything himself, but it is sufficient if he caused it to be mailed, or does an act with knowledge that the use of the mails will follow in the ordinary course of business or that it can reasonably be foreseen. *Pereira, supra* at 8–9.

We note at the outset of this section that the government alleged and offered evidence that there was one overall scheme to obtain property, clear special assessment liens and dispose of properties. Criminality, with respect to any phase, as discussed in Part II, *supra,* is sufficient assuming that the count mailing in question dealt with a general aspect of the whole scheme or with properties which were the subject of some fraudulent part of the scheme.

A

The first of three groups of mailings deals with the receipt of proceeds from the fraudulent scheme. Since the scheme would have no value

---

**29.** With respect to the sale of lots to M.S.D., we believe that standing alone the evidence was insufficient to justify the conclusion that undue influence was used by Keane.

**30.** At trial the government on its own motion dismissed Counts V, IX and XVIII.

without the sale of the properties, all the mailings relating to the negotiations and the ultimate sale of properties either acquired by virtue of inside information, subject to City Council action in which the defendant participated to clear special assessment liens or disposed of through the use of undue influence, are proper counts. A mailing in furtherance of the collection of proceeds from a fraudulent scheme is sufficient under the mail fraud statute. *Pereira, supra* at 8; *United States v. Britton,* 500 F.2d 1257, 1259 (8th Cir. 1974).

The Counts VI and XIX letters dealt with a problem in the proposed sale of properties, some of which had been the subject of City Council action, to National Homes Corporation. Resolution of this problem was essential to the eventual sale.

The Counts VIII, XIV, XV and XX mailings all dealt with the offer and acceptance of real estate contracts between the Alpine partners and United States Steel. The properties that United States Steel purchased, although apparently not subject to City Council action to remove special assessment liens, were among the group that was purchased by the Alpine partners pursuant to advance information about the 87th and Mackinaw development project.[31]

Count II involved a letter from the City offering to purchase from the Alpine partners a lot obtained because of advance information about the 87th and Mackinaw development project.[32]

Count IV involved a sale of parcel, which had been subject to City Council action, to C.H.A. The letter referred to

matters necessary to complete the sales transaction.

Count XII involved a letter dealing with the acquisition of property, not subject to City Council action, by C.D.A. From all the evidence the jury could believe that the C.D.A.'s acquisition of this parcel was attributable to Keane's use of undue influence on Swibel.

 Only the Count I mailing in this group is insufficient to sustain a conviction. That letter was merely an acknowledgment of payment from Hennessey to Leon Mayer, a purchaser of Alpine lots. The acknowledgment served no purpose in the fraud and was not connected with the collection of proceeds from the fraud.[33] *See, e. g., United States v. Isaacs,* 364 F.Supp. 895, 903 (N.D.Ill.1973), *aff'd,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). Accordingly, the conviction on Count I is reversed.

B

 The second major area into which the account mailings have been classified are those relating to financing the scheme. The Count III mailing is a letter from Hennessey, which accompanied a check for $35,000 to the Jefferson State Bank in partial payment due on the loan of the Alpine partners. The beneficial interest of Alpine's land trust No. 53129 was assigned to the Jefferson State Bank as collateral. Thus, repayment of the money borrowed to purchase the parcels[34] was necessary to prevent the fruits of Alpine's venture from being lost to the Jefferson State Bank. Con-

---

**31.** The fact that these properties were disposed of by the defendant and his partners to a party not anticipated by the advance information is insignificant. The fraudulent scheme was acquiring the properties with inside information, the actual disposition of the properties to any purchaser, completed the scheme.

**32.** We deem it insignificant that the City made the initial offer.

**33.** The second paragraph of this letter stated that the second payment, which was due in

ninety days, was without interest. This letter did not purport to be a second billing or even attempt to negotiate the payment procedures. The reference appears to be no more than a casual reminder to Mayer that his next payment was without interest—something that was not particularly beneficial to the Alpine partners and which was at most merely incidental to the scheme.

**34.** In actuality the Jefferson State Bank loan was used to pay off another bank loan, the proceeds of which had been used in the actual purchase at the 1966 scavenger sale.

tinuation of ownership so that the parcels could be disposed of for a profit, was essential to the overall scheme.

The mailings of Counts XI and XIII, however, stand on a different footing. Both letters involve mailings by Bernard Feinberg, President of the Jefferson State Bank to Hennessey acknowledging payments on the loan. The government's argument that keeping the loans current worked to the benefit of the co-conspirators may well be true, but it still does not make the acknowledgments received from the bank an integral part of or in furtherance of the scheme. *United States v. Isaacs,* 364 F.Supp. at 903. The convictions on Counts XI and XIII are reversed.

### C

The final area in which the count mailings have been classified are those in furtherance of concealment of the fraudulent scheme. *See, e. g., United States v. Joyce,* 499 F.2d 9, 18 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974).

■ The Count VII mailing was a letter from a trust officer at Chicago Title and Trust to Nathan Slutzky granting permission to the latter to file an appearance in foreclosure of special assessment cases involving Chicago Title and Trust land trust No. 53129 in which Alpine properties were held. While it is probably true, as the defendant argues, that it did not make much difference who represented the Alpine interest at the various Subcommittee meetings, obtaining an attorney for such representation was undoubtedly necessary and also allowed Keane, although a lawyer, to avoid representing the Alpine partnership himself, thus keeping his interest secret.[35]

■ The Count X mailing is an invoice from the trust department of the Illinois State Bank seeking compensation for services rendered in relation to Land Trust No. 149. This land trust held properties that were accorded favorable treatment at the June 26, 1970 meeting of the Subcommittee on Special Assessments. Payment of trust fees, as requested by the invoice, played a direct role in keeping Keane's interest undisclosed.[36]

■ Counts XVI and XVII involved letters from the trust department of the Illinois State Bank in response to Hennessey's request for an accounting of what properties remained in Land Trust No. 149[37] and 139. At various times both trusts contained properties which had been accorded preferential treatment by the City Council. A reply in response to a letter seeking information as to whether any of these properties remained, so presumably they could be sold, is in furtherance of the scheme.

### IV

■ The defendant next challenges the use by the government of certain Illinois statutes and a rule of the City Council, and the reading of them to the jury, all of which defendant argues either do not apply to him or were not violated by his actions. Having previously concluded that even without reference to the challenged material that the scheme in which Keane was involved was violative of the mail fraud statute,

---

**35.** We reject defendant's contention that since Keane did not know that Hennessey had engaged Slutzky that he was not responsible for the mailing. Keane and Hennessey were in the project jointly and the fact that Keane delegated day-to-day responsibility for Alpine's affairs to Hennessey does not relieve him of responsibility.

**36.** It is conceded that land trust No. 149 held only properties owned by Wabash Investments in which Keane's wife was a partner. The

evidence was conflicting as to whether Mrs. Keane was a bona fide investor or whether she represented only investment interests of her husband. The jury was certainly entitled to believe the latter alternative, given the testimony concerning Keane's control over Wabash Investments and the fact that Wabash properties were submitted to Fifielski's Subcommittee on June 26, 1970, along with THAK and Alpine properties.

**37.** *See* note 35, *supra.*

**554**

in this section it is only necessary to consider whether the statutes and City Council rule were totally inapplicable to this case and so prejudicial so as to require a reversal.[38]

The district judge prefaced his reading of the Illinois statutes and the City Council rule with the following:

> In deciding whether the defendant defrauded the City of Chicago and its citizens and Keane's fellow aldermen of their right to the loyal and faithful services of the defendant Keane and of their right to have the City's business and its affairs conducted honestly and free from conflict of interest in accordance with the laws of the State of Illinois and the City of Chicago, you may consider the Illinois statutes and Rule 14 of the Rules of Order of the City Council of the City of Chicago that I am going to bring to your attention.

Following the reading of the statutes and rule the judge instructed:

> Now, the existence of such laws and the City Council rules serve to define the standard of conduct expected of the defendant Keane by the citizens of Chicago and the defendant's fellow aldermen. You may consider them for

that purpose. The existence of such laws and City Council rules may also be considered by you as relevant to the defendant's intent to defraud if any such intent existed.

Although the defendant objected initially to the reading of the statutes and rule, once the trial judge decided they would be read, defendant's counsel approved the above instructions. We were directed to no point in the record where the defendant requested that the Illinois statutes and City Council rule be further explained to the jury. Therefore, we consider whether the failure to explain them further was plain error and thus reversible without objection below. Fed. R.Crim.P. 52(b).

 There is no rule that the reading of a statute as part of a charge to the jury is per se insufficient. *See generally Casella v. United States*, 449 F.2d 277, 283 (3d Cir. 1971), *cert. denied*, 405 U.S. 929, 92 S.Ct. 981, 30 L.Ed.2d 803 (1972); *United States v. Powell*, 145 U.S. App.D.C. 332, 449 F.2d 994, 998 (1971). This is even more true where, as here, the statutes and rule were only one aspect of the whole case rather than the basis of the charges against the defendant. Complete instructions as to what

---

**38.** Since the crux of this case does not depend on the violation of specific Illinois statutes, we find no merit in defendant's contention that the court below should have abstained from trying this case, because of the complex state regulatory scheme involved or the pending state civil action against the defendant.

The state court civil proceeding against the defendant was dismissed on the grounds that the plaintiff lacked standing because "not one cent of the City's money is expended" and because "no public trust [is] involved in the case at bar." *City of Chicago ex rel. Cohen v. Keane*, No. 74 CH 2825 (Cir. Ct. of Cook County, Sept. 20, 1974) (order).

We note first that the thrust of Judge Cohen's decision was that there could be no standing where there had been no loss of City funds. The court made no definitive ruling on the applicability of the challenged statutes to the facts of this case. The fact that under Illinois law a loss to the city must be shown before standing is granted to a plaintiff, *Golden v. City of Flora*, 408 Ill. 129, 96 N.E.2d 506 (1951), stands in sharp contrast with actions for mail fraud for which no loss to the victim

need be shown. *United States v. Reicin*, 497 F.2d 563 (7th Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974).

Even if the state court had determined that the statutes were inapplicable, although persuasive, we would not be bound by that decision inasmuch as conviction for mail fraud is not dependent upon a violation of state law. *United States v. States*, 488 F.2d 761, 767 (8th Cir. 1973), *cert. denied*, 417 U.S. 909 and 950 (1974); *United States v. Edwards*, 458 F.2d 875, 880 (5th Cir.), *cert. denied*, 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972). Finally, it is also clear that an acquittal or assurances from state officials to the defendant that what he did was proper is not sufficient to stay a federal prosecution for mail fraud. *See generally United States v. Hutul*, 416 F.2d 607, 626 (7th Cir. 1969), *cert. denied*, 396 U.S. 1007, 1012 and 1024, 90 S.Ct. 562, 573, 599, 24 L.Ed.2d 499, 504, 517 (1970); *United States v. Sylvanus*, 192 F.2d 96, 106 (7th Cir. 1951), *cert. denied*, 342 U.S. 943, 72 S.Ct. 555, 96 L.Ed. 701 (1952); *United States v. Anzelmo*, 319 F.Supp. 1106, 1117 (E.D.La.1970).

actions can constitute a fraudulent scheme under the mail fraud statute without reference to the Illinois statutes and City Council rule were given. The statutes and rule were offered to show the general conduct expected of the defendant, so that the jury could better determine if there was a fraudulent scheme.[39] While it might have been helpful to the jury to give a more detailed explanation of the state laws and Council rule, we cannot say it was plain error not to do so.

The only question that remains with respect to the state statutes and the City Council rule is whether it was error for them to be judicially noticed, and presented to the jury.

■ Ill.Rev.Stat. ch. 24, § 3–14–4 provides that no municipal officer shall be interested in the purchase of any property sold for taxes or assessments.[40] On its face the provision would appear to bar Keane from participating in any scavenger sale where property was being sold for taxes in Illinois. While we might be persuaded to agree with the defendant that such a broad reading of the statute would be beyond the obvious legislative purpose of avoiding conflict of interests, we nevertheless believe that a reasonable interpretation of the statute would have barred Keane from participating in the 1966 Cook County scavenger sale where a large number of parcels to be sold were located within Chicago.[41]

■ The next statute of which the defendant complains is Ill.Rev.Stat. ch. 102, § 3 which prohibits any public official from being interested in any contract upon which such officer may be called upon to vote.[42] This is a classic

39. The defendant argues that the state statutory scheme was so complex that further explanation was required. The difficult question with regard to the statutes was their applicability to the present case, a question that the district judge resolved against the defendant.

40. Ill.Rev.Stat. ch. 24, § 3–14–4 provides:

No municipal officer shall be interested, directly or indirectly, in any contract, work, or business of the municipality, or in the sale of any article, whenever the expense, price, or consideration of the contract, work, business, or sale is paid either from the treasury or by any assessment levied by any statute or ordinance. No municipal officer shall be interested, directly or indirectly, in the purchase of any property which (1) belongs to the municipality, or (2) is sold for taxes or assessments, or (3) is sold by virtue of legal process at the suit of the municipality.

41. Although the 1966 scavenger sale was for properties on which county taxes were delinquent, we were advised at oral argument that the county would turn over to the City, a substantial amount of money with respect to parcels located within Chicago.

In addition, Ill.Rev.Stat. ch. 120, § 716a, the section pursuant to which the 1966 scavenger sale was held provides that "The State of Illinois or any taxing district . . . may bid at such sale." Similarly, Ill.Rev.Stat. ch. 120, § 725 provides:

Any incorporated city, town or village, or corporate authorities, commissioners, or per-

sons interested in any special assessment or installment thereof, may become purchaser at any sale, and may designate and appoint some officer or person to attend and bid at such sale on its behalf.

We reject the defendant's argument that the City could under no circumstances have been a bidder at this sale because the sale did not involve the extinguishment of special assessments. On their face neither section 716a nor 725 make such a condition a prerequisite to the City exercising its power to acquire real property for corporate purposes.

The above being true, it would not be unreasonable to believe that the legislature sought to prohibit purchases by municipal officials of property within their municipality sold for taxes or special assessments by the county as is the situation in this case. Not only does such an interpretation prevent potential conflict of interest but also avoids use of advance or inside information concerning properties within their city, by municipal officials.

In addition, section 3–14–4 prohibits municipal officers from being interested in the sale of any article whenever the price is paid from the treasury of the municipality. At least with respect to land sold to D.U.R. for the redevelopment program, the City was responsible for one-third of the cost. Even if the City made in kind contributions, as defendant contends, the reading of the statute was relevant as to the state policy against conflict of interests.

42. Ill.Rev.Stat. ch. 102, § 3 provides in part:

No person holding any office, either by election or appointment under the laws or

conflict of interest statute. The government's position is that "compromise offers" and "minimum bids" were in effect agreements between the City and Keane on which he was required to vote. Thus, Keane was in a classic conflict of interest situation. Without deciding that a state court would apply this statute to this situation, it is sufficient to say that the jury was free to accept the defendant's argument that no contract was really involved because of the pro forma nature of the transaction and the alleged ministerial functions of the City Council. The introduction of the statute, however, was not reversible error.

Another Illinois statute which was judicially noticed and read to the jury and of which the defendant complains is Ill.Rev.Stat. ch. 102, § 3.1 which compels disclosure of all beneficial owners of property sold to any local governmental unit.[43] The defendant argues that the statute imposed a duty only on Hennessey to disclose the beneficial owners, since he was the managing agent of the properties. The government responds that a conspiracy was alleged in the indictment, and that Hennessey's failure to disclose Keane's interest in writing, so as to keep it from public view, is attributable to the defendant. A co-conspirator need not have knowledge of every detail of the plan. *See, e. g., Blumenthal v. United States,* 332 U.S. 589, 557, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Fellabaum,* 408 F.2d 220, 224 (7th Cir.), *cert. denied,* 396 U.S. 818 and 858, 90 S.Ct. 55, 125, 24 L.Ed.2d 69, 109 (1969). Under these circumstances it was not error to read section 3.1 to the jury so it would be apprised of the fact that it was the policy of Illinois to require disclosure of interests in transactions conducted with public agencies.

The final statute, the reading of which the defendant objects to, is Ill.Rev.Stat. ch. 38, § 33–3 which provides that a public officer commits a misdemeanor when he "[k]nowingly performs an act which he knows he is forbidden by law to perform." Our disposition with regard to the previous statutes makes it clear that the reading of this statute was not error.[44]

In addition to objections to the Illinois statutes, the defendant also objects to the reading of City Council Rule 14 which provides:

Every member who shall be present when a question is stated from the Chair shall vote thereon, unless excused by the Council or unless he is personally interested in the question, in which case he shall not vote.

The last sentence, which is mandatory in nature, on its face belies defendant's contention that the rule was directed only at requiring aldermen to vote on all matters and not directed at conflict of interests. The defendant makes similar arguments with respect to the rule as he

constitution of this state, may be in any manner interested, either directly or indirectly, in his own name or in the name of any other person, association, trust or corporation, in any contract or the performance of any work in the making or letting of which such officer may be called upon to act or vote.

**43.** Ill.Rev.Stat. ch. 102, § 3.1 provides:

Before any contract relating to the ownership or use of real property is entered into by and between the State or any local governmental unit or any agency of either and a trustee who has title to such real property or a managing agent having power to contract in relation to such real property, such trustee or managing agent must disclose the identity of every owner and beneficiary having any interest, real or personal, in such property. The disclosure shall be in writing and shall be subscribed by such trustee or managing agent under oath. This Section shall be liberally construed to accomplish the purpose of requiring the identification of the actual parties benefitting from any transaction with a governmental unit or agency involving the procurement of the ownership or use of real property thereby.

This statute became effective on September 30, 1969, and thereafter ten lots in which Keane had an interest were sold to the C.H.A.

**44.** The question of whether defendant knowingly committed any act that was forbidden was, of course, a jury question, and is irrelevant to the issue of whether this section should have been read or not.

made in connection with his effort to show that no fraudulent scheme against the City was involved. *See* Part II B, *supra.* For the same reasons we gave in rejecting defendant's claim earlier, it is clear that the reading of this rule was not erroneous and was properly admissible to show a standard of conduct expected among aldermen and to show Keane's fraudulent intent.

We conclude that it was not error for the district judge to judicially notice and then present to the jury the previously discussed Illinois statutes and City Council rule.

### V

The defendant's final contentions raise challenges with respect to certain evidentiary rulings and other matters which arose during the course of the trial.

### A

■■ The defendant argues that he was wrongfully deprived of a random assignment of a trial judge by the action of the Executive Committee of the Northern District of Illinois in assigning the case to Judge Decker pursuant to their procedures for handling "protracted, difficult or widely publicized cases." *General Order,* Northern District of Illinois, Eastern Division (May 17, 1972). For the reasons stated by the Executive Committee in its memorandum opinion, *United States v. Keane,* 375 F.Supp. 1201 (N.D.Ill.1974), we find the defendant's argument without merit. *See also United States v. Braasch,* 505 F.2d 139, 147 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975).

### B

The next claimed error is with respect to the letter from Gerald Broderick, an attorney for C.D.A., to Robert Snow, land acquisition director for C.H.A., dealing with the acquisition of property by C.H.A. for C.D.A. use. *See* Part I C, *supra.* The challenged portion of the letter read "Mr. Bach [C.D.A. Executive Director] informed me [Broderick] that Mr. Swibel [C.H.A. Chairman and C.D.A. Director] told him to purchase these lots as swiftly as possible. . . ." The letter was introduced in support of the government's claim that Keane used undue influence on Swibel in order to have certain lots purchased.

■■■ A writing is a business record if it was made in the regular course of business and it was the regular practice of such business to make such a record. 28 U.S.C. § 1732. It is clear that a letter from one party to another, if done in the normal course of business can qualify as a business record. *See United States v. Kelly,* 349 F.2d 720, 772–73 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *Grummons v. Zollinger,* 240 F.Supp. 63 (N.D.Ind. 1964), *aff'd,* 341 F.2d 464 (7th Cir. 1965). It is also clear from all of the testimony concerning the relationship between C.H.A. and C.D.A., that the letter in question met the above requirements.[45]

The thrust of defendant's challenge is directed at the fact that Broderick's letter purports to repeat what Swibel told Bach as related by Bach to Broderick. The fact that Broderick, who was in effect the maker of the record, was told something by Bach does not render the record inadmissible. Many business records are made by the entry of data related by one employee either orally or through memorandum to another employee responsible for record-keeping. In this case, unlike the cases on which the defendant has relied,[46] Bach was under a "business duty" to report accurately to Broderick since the acquisition of land was an integral part of C.D.A.'s functions. *United States v. Karnap,* 477 F.2d 390, 392 (4th Cir.), *cert. denied,* 414

**45.** The government states and the defendant does not challenge in his reply brief that defense counsel stipulated to the entire C.D.A. file in which the Broderick letter was included. Even when the letter was about to be read to the jury defense counsel conceded that it was a business record.

**46.** *See, e. g., United States v. Burruss,* 418 F.2d 677 (4th Cir. 1969); *United States v. Shiver,* 414 F.2d 461 (5th Cir. 1969).

U.S. 867, 94 S.Ct. 66, 38 L.Ed.2d 87 (1973); *United States v. Smith,* 452 F.2d 638, 640 (4th Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1617, 31 L.Ed.2d 822 (1972). In addition, Broderick's letter was contemporaneous with Bach's report to him and there appears to have been no motive to misrepresent on the part of either Bach or Broderick. V J. Wigmore, Evidence, §§ 1526, 1527 (3d ed. 1940).

The defendant argues, however, that Bach could not have Broderick include on the "business record" the fact that Swibel told him to "purchase these lots as swiftly as possible. . . ." because it is hearsay and Bach could not have testified as to what Swibel told him. We disagree.

Whether any given out-of-court statement is hearsay depends on the issue for which it is offered. In the present case the ultimate issue is whether Keane used his influence on Swibel, with the particular testimony intended to show that after Keane talked with Swibel that Swibel took action to have the lots purchased.

█ In one sense Swibel's statement is similar to an order, and is not capable of being true or false, and thus it is not offered for the truth of any matter asserted. It is offered solely for the fact that the statement was made, which standing by itself makes it relevant on the question of whether Keane had requested Swibel to purchase some of his properties.

█ To the extent that Bach's statement carries with it an implied assertion that Swibel desired or intended to have the lots purchased, it represents a declaration of his state of mind, capable of being shown only by Swibel's statements and subsequent actions and thus is admissible as an exception to the hearsay rule. VI Wigmore, *supra* § 1729; C. McCormick, Law of Evidence, § 294–95 (1972). There was no error in the introduction of the Broderick letter.

C

The defendant next contends that in certain respects the trial judge unduly limited his right to cross-examination.

█ He first complains about the sustaining of the government's objections to defendant's questions about the intent of Hennessey and Junior with regard to the alleged scheme. He argues that if neither Hennessey nor Junior had the requisite criminal intent, then Keane could not be convicted on the conspiracy count.

We have reviewed the question placed by defense counsel to Hennessey and we agree with the government's contention that it dealt only with Hennessey's state of mind with respect to Alpine's bargaining strength with public agencies, and not with respect to the alleged fraudulent scheme as a whole. This being so the issue of Hennessey's intent to defraud was never placed in issue.

Furthermore, there were a sufficient number of denials of wrongdoing by both Hennessey and the defendant for the jury to be apprised of their claim of no wrongful intent. The jury, however, had sufficient evidence of the actions of Hennessey, Junior and Keane from which to conclude that there existed the requisite criminal intent.

█ The defendant also argues that he was limited in his cross-examination of Earl Neal and Nathan Slutzky. With respect to Neal any error was clearly non-prejudicial and harmless in that the defendant adopted Neal as its own witness and obtained an answer to the question that had been the subject of the government's objection.

█ With respect to Slutzky the defense was not allowed to ask on cross-examination if he had ever received other than 10 percent minimum bid treatment when representing Hennessey and Keane on dates other than June 26, 1970. Again, without holding that the trial judge improperly limited cross-examina-

tion, any error was clearly harmless. The defendant made its showing through government and defense summary exhibits that properties in which Keane had an interest did not always receive 10 percent treatment. In any case the fact is not a significant defense to the government's theory of the case and our resolution of the primary issues on appeal.[47]

## D

 The defendant next objects to the evidence introduced by the government in rebuttal. One of the questions placed into issue was Keane's intent to defraud with respect to the charged scheme. After first questioning Keane concerning a 1962 incident in which the City Council placed Keane on notice that, when voting on matters affecting his law clients he had an obligation to disclose this interest, the government inquired of Keane whether he had been involved in the representation of the American National Bank in 1967 with regard to a zoning matter on which he had voted. Keane denied any representation of the Bank, any conversation with Mr. Don Reuben concerning this matter and any payment for services rendered.

On rebuttal Reuben testified that he had in fact talked with Keane about the Bank's zoning problem, and that Keane and Alderman Paul Wigoda had agreed to work for the accomplishment of the Bank's request. In addition, evidence was introduced showing that shortly after Wigoda had received a check for $15,000 for representing the Bank, Keane was given a check from Wigoda for $7,500.

The evidence was proper to show a prior similar act by Keane of non-disclosure of matters in which he was interested and on which he voted. The evidence

was probative of Keane's intent to defraud. Evidence of prior similar acts are "particularly appropriate where, as with mail fraud, criminal intent is an essential element of the crime charged." *United States v. Hutul,* 416 F.2d 607, 624 (7th Cir. 1969), *cert. denied,* 396 U.S. 1007, 1012 and 1024, 90 S.Ct. 562, 573, 599, 24 L.Ed.2d 499, 504, 517 (1970). *See also United States v. Hoffman,* 415 F.2d 14, 18–19 (7th Cir.), *cert. denied,* 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969); *United States v. Marine,* 413 F.2d 214, 216 (7th Cir. 1969), *cert. denied,* 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493 (1970).

## E

The defendant also raises objections in relation to the charge given to the jury.[48]

The defendant challenges the instruction to the jury that it could consider the evidence concerning the American National Bank transaction with respect to Keane's intent during the pendency of the alleged scheme. The jury was clearly instructed that the defendant was not on trial for this transaction and for the reasons we gave for the admissibility of the rebuttal testimony, we find no error in the instruction given. *See* Part V D, *supra.*

 The defendant next contends that it was error not to give his proffered instruction which stated that the C.H.A., C.D.A. and M.S.D. were state-created agencies, separate and distinct from the City of Chicago. The defendant argues that by refusing to give this instruction the jury was prevented from considering the defense theory of the case that Keane could not have been in a conflict of interest position with these agencies.

We note first that the government never contended, nor was it necessary to their case, that the agencies were one

---

**47.** *See, e. g.,* note 19, *supra.*

**48.** We have previously discussed defendant's argument concerning the instructions given to

the jury in connection with the Illinois State statutes and City Council rule 14. *See* Part IV, *supra.*

and the same as the City, and in any event Keane was not precluded from presenting evidence on his theory. *See e. g., United States v. Tremont,* 429 F.2d 1166, 1169–70 (1st Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 63 (1970). Giving the proffered instruction would have served only to emphasize an evidentiary fact proved at trial by one side. *United States v. Thomas,* 484 F.2d 909, 912 (6th Cir. 1973), *cert. denied,* 415 U.S. 924, 94 S.Ct. 14, 28, 39 L.Ed.2d 480 (1974); *United States v. Terry,* 362 F.2d 914, 916 (6th Cir. 1966), *cert. denied,* 385 U.S. 1029, 87 S.Ct. 758, 17 L.Ed.2d 676 (1967); *Blauner v. United States,* 293 F.2d 723, 737–38 (8th Cir.), *cert. denied,* 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

We note further that Keane was in a position to vote on acquisition sites for C.H.A. and C.D.A., so that the defendant's theory of no possible conflict of interest was not entirely accurate. In addition, the sale of properties to governmental agencies, in almost all cases, only completed the fraudulent scheme which had been implemented by Keane's actions in clearing special assessments liens or his use of advance information in acquiring parcels. In any event the failure to give the instruction was harmless error. In cases of sales to C.H.A. and C.D.A. where the claim of undue influence arguably was necessary to sustain the conviction,[49] there was a sufficient relationship between the functions of the agencies and the City Council for the jury to believe that Keane was in a position to exert influence notwithstand-

ing the fact that the agencies were independent.

### F

The final charge of reversible error is in connection with the closing argument of the government. Specifically defendant claims that the prosecution repeatedly and without evidence in the record referred to Keane's power and "clout" and his potential control of the testimony of many of the witnesses called in this case.[50]

It is clear that "[w]hile a continuously inflammatory argument may be grounds for reversal, courts have long recognized that, on the other hand, the prosecutor cannot be restricted to a sterile recitation of uncontroverted facts." *United States v. Greene,* 497 F.2d 1068, 1085 (7th Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). *See also Brandom v. United States,* 431 F.2d 1391, 1397 (7th Cir. 1970), *cert. denied,* 400 U.S. 1022, 401 U.S. 942, 91 S.Ct. 586, 950, 27 L.Ed.2d 634, 28 L.Ed.2d 223 (1971). In addition we must consider defendant's claim in the context of the whole closing argument and the fact that the alleged errors related to only a brief part of a hotly contested four-week trial. *Greene, supra* at 1085. Similarly, it is clear that "unflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence." *United States v. Windom,* 510 F.2d 989, 994 (5th Cir. 1975); *United States v. Cook,* 432 F.2d 1093, 1106 (7th Cir. 1970), *cert. de-*

---

**49.** The only counts to which the instruction the defense offered could have been relevant were Counts IV and XII involving sales of properties to the C.H.A. and C.D.A. None of the other counts were premised on an undue influence charge. Count IV involved properties which had been the subject of City Council action and therefore has a basis for the finding of guilty independent of the undue influence charge.

**50.** The only factual inaccuracy which the defendant claims the government made was that Keane had denied voting on the American National Bank zoning matter which in fact he did not deny. It is clear from the record that counsel accidentally misspoke. Indeed, the government was attempting to show that Keane did vote without disclosing his interest. The trial judge upon defense objection stated that he was going to rely on the jury for their recollection of the evidence. The error was clearly harmless. *United States v. Maenza,* 475 F.2d 251, 254 (7th Cir. 1973).

*nied,* 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971).

We find the defendant's argument as to the characterization of Keane without merit. There was sufficient evidence of his long tenure as an alderman and as chairman of the powerful Finance Committee. Similarly, there was proof that he appointed the chairman of the Subcommittee on Special Assessments and served on other council committees and other public commissions. Keane contacted numerous public officials and others in attempts to dispose of Alpine, THAK and Wabash lots, and it was not improper for the government to in effect argue that these contacts were available to Keane because of his position of power.[51]

With respect to government counsel's remarks that some of the witnesses called and others not called were subject to the influence of Keane, we find no error. There was no government statement that Keane had suborned perjury, only that some of the witnesses called were in positions where they may have felt obliged to please Keane. This amounted to no more than permissible argument on their purpose for testifying as they did and on their credibility. *United States v. DeAngelis,* 490 F.2d 1004, 1008 (2d Cir.), *cert. denied,* 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974); *United States v. Cappello,* 327 F.2d 378, 379 (2d Cir. 1964); *United States ex rel. Kirk v. Petrelli,* 331 F.Supp. 792, 796 (N.D.Ill.1971), *aff'd by order,* 492 F.2d 1245 (1974). *See also* ABA Standards for Criminal Justice, *The Prosecution Function,* § 5.8(b), commentary, (approved draft, 1971).

The evidence generally showed close working relationships between Keane, and Hill, Neal and Swibel, individuals on which the government commented during closing argument. The government can prove its case in any manner it desires, so long as it meets its burden in a fair manner. If it desires to call some witnesses only for limited purposes or chooses not to call others and the defendant, as here, argues that this represents a weakness in the government case, the defendant invites a response as to why the government chose the trial strategy that it did. *See e. g., United States v. Nowak,* 448 F.2d 134, 141 (7th Cir. 1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972); *United States v. Lawler,* 413 F.2d 622, 628 (7th Cir. 1969); *cert. denied,* 396 U.S. 1046, 90 S.Ct. 698, 24 L.Ed.2d 691 (1970). There was no reversible error committed by the prosecutors during their closing and rebuttal arguments.

We have examined other contentions of trial error and find them equally without merit.

For all of the foregoing reasons we reverse the conviction as to mail fraud Counts I, XI, XIII, and affirm the conviction on mail fraud Counts II, III, IV, VI, VII, VIII, X, XII, XIV, XV, XVI, XVII, XIX, XX. We also affirm the Count XXI conspiracy conviction.

Affirmed in part and reversed in part.

---

**51.** In addition we reject the defendant's claim that references to Keane as a wealthy man and the ease with which he, as opposed to others, obtained a large loan was reversible error. While it is true that appeals to a juror's pecuniary interest are improper, we believe that here the reference was not directly related to the pecuniary interest of the jurors. The reference to the ease of obtaining loans was consistent with the government's theory of Keane's use of influence to obtain benefits. There was no statement that the benefit to Keane was at the expense of the jurors. Thus this case is unlike *United States v. Trutenko,* 490 F.2d 678 (7th Cir. 1973).