**UNITED STATES of America,**
**Appellee,**

v.

**Philip PELTZ, Appellant.**

**No. 141, Docket 34578.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1970.

Decided Oct. 19, 1970.

Judah Best, Washington, D. C. (Dickstein, Shapiro & Galligan, Washington, D. C., of counsel), for appellant.

Harold F. McGuire, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York and John H. Doyle, III, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, SMITH and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

After trial in the District Court for the Southern District of New York, Philip Peltz, an attorney, was convicted on the four counts of an indictment which Judge Weinfeld submitted to the jury. Count One charged that Peltz had conspired with an employee of the Securities and Exchange Commission to defraud the United States and the Commission of their rights to have their business conducted impartially and according to law and to have the securities laws administered impartially and according to their terms, in violation of 18 U.S.C. § 371. Counts Three and Four charged willful violations of § 10(b) of the Securities Exchange Act of 1934 and the SEC's Rule 10b-5 in that Peltz had told two brokerage houses that sales of the common stock of Georgia Pacific Corporation which he had ordered were long whereas in fact they were short. Count Five charged that Peltz willfully violated § 10(a), relating to short sales, and the Commission's Rule 10a-1(a). The court imposed four concurrent one-year sentences, three months of which were to be served in prison; the remainder of the term was suspended as to each count.

The first count charged that from about January 1, 1966, Peltz had conspired with others, including an employee of the SEC, to obtain confidential inside information about matters under consideration by the Commission and use such information for private profit. Specific mention was made of the Georgia Pacific Corporation and Peltz' sales of its stock. The proof identified the employee as Murray B. Weiner, a branch chief of the SEC's corporation finance division.

Essential background was furnished by the testimony of Ira Pearce, who at the time was a branch chief of the SEC's trading and markets division and whose integrity was not in question. On or about March 11, 1966, Pearce had rec-

ommended that the SEC bring suit against Georgia Pacific because the company had apparently been purchasing its own securities through a pension fund it controlled, thereby influencing the market for its own stock in violation of the securities laws. The Commission approved the suit on or about March 24. During April Weiner asked Pearce about the current status of the matter, and Pearce kept him posted as to the target date for the filing of the action. This was originally April 15 but was postponed to April 27.

On April 7, Peltz telephoned a registered representative at Bache & Co., told him he was thinking of selling 1,000 shares of Georgia Pacific which he owned because he had heard there was a lawsuit pending against the company, and directed him to sell the shares at no less than a specific price. In fact, Peltz did not own the shares at that time. On the same day, he instructed a registered representative at Loeb, Rhoades & Co. to sell 2,000 shares allegedly belonging to his mother but, according to the proof, not in fact owned by her. Four days later Weiner asked a former SEC attorney to recommend a broker for Peltz; the attorney suggested a representative at Sterling, Grace & Co., with whom Peltz placed sell orders for 300 shares as long sales. The proof again was that Peltz did not own these shares. All of Peltz' sales instructions were carried out. He made various excuses for not delivering the shares on the settlement dates but, after the SEC suit was announced and the price of Georgia Pacific fell, he borrowed enough money to enable him to cover his short sales and make a tidy profit.

The most damaging testimony against Peltz was given by a friend, Norman Horwitz, an attorney with experience in securities matters, and Horwitz' wife, Sheila, who in April 1966 was his fiancée. According to them, Peltz indicated that he had a "contact" at the SEC who had previously given him information about several companies that were to be or had been investigated by the agency. On April 14, Peltz told them, in Sheila's apartment in New York City, that he had obtained information from his "contact" at the SEC concerning proposed action against Georgia Pacific and had sold several thousand shares, but that he was having trouble "buying in" because the SEC had not made its announcement and the price of the stock had not yet dropped. Peltz then accompanied Horwitz to the latter's office and placed a call to a number identified as Weiner's residence in Maryland. After completing the call, he declared that "Everything is okay, it's going to be released in a day or two, they're working on the final papers." Sheila testified that Peltz telephoned her apartment several times during the following week. Once he asked her to inform Horwitz that he thought news of the investigation would shortly break; on other occasions he simply provided progress reports. In a subsequent conversation, he told her that in his law practice he had defended prostitutes and "sometimes he would get the company of these girls for his friend in Washington." Early in May, Peltz expressed concern about being watched by the FBI and, in answer to an inquiry whether he had paid money, said he had not but "expected this fellow would be in shortly" and hoped to avoid paying or seeing him.

A Miss Parkhurst testified that in February 1966 Peltz had phoned her to say that he had a friend called Mel Fein (a name evidently used for Weiner [1]), to whom he owed a favor and who was at another friend's apartment. Peltz was unable to entertain him and asked Miss Parkhurst to help. She obliged by going to the apartment and having sexual relations with "Fein." Some two months later, she reported to Peltz that she had received a call from "Fein." Peltz became hysterical and told her not to see

1. At trial, Miss Parkhurst was shown two photographs both of which were apparently of Weiner. She testified that "The gentleman on the left is Mel Fein," and the photograph on the right "looks like him," but she was not "positive."

"Fein" again because he was involved in something and that she should not discuss "Mr. Fein or anything" with the FBI if they came to investigate.

### I.

The statute, 18 U.S.C. § 371, on which Count 1 was based, provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The portion of the enactment relating to defrauding the Government is peculiar, perhaps even unique, in the federal penal code in that it punishes a conspiracy to defraud although the fraud may not constitute a substantive offense under any of the statutes dealing with various forms of corrupting government employees.

▮▮▮ Peltz' first argument is that the evidence was insufficient to show an agreement between himself and Weiner, as distinguished from a disclosure solely at the latter's initiative, which the Government concedes would not constitute a violation of the conspiracy statute however offensive such conduct would be. But the testimony permitted a rational conclusion that there was a working relationship between the two men. Apart from the evidence of earlier tips, the recipient of unsolicited information would normally not feel entitled to pursue the informant with inquiries why the tip had not been made good or request his help in getting a broker. While it is unnecessary to a conspiracy that the

relationship contemplated mutual benefit, however unlikely the contrary might be, the jury could have found an agreement that Weiner was to be rewarded by Peltz' procuring female company,[2] and, indeed, that he had been given some reason to expect money as well.

▮▮ Peltz' second challenge to his conspiracy conviction is that the statute is inapplicable when, as here, the Government suffered no pecuniary harm and there was no intention to prevent its taking the action contemplated. This meets the seemingly insurmountable obstacle of the holding in Haas v. Henkel, 216 U.S. 462, 476–480, 30 S.Ct. 249, 54 L.Ed. 569 (1910), that Rev.Stat. § 5440, the predecessor of 18 U.S.C. § 371, prohibited an alleged conspiracy to obtain information from an employee of the Department of Agriculture in advance of the regular release dates of its cotton crop reports and to use such information for speculation upon the cotton market.[3] Peltz' contention that Hammerschmidt v. United States, 265 U.S. 182, 44 S.Ct. 511, 68 L.Ed. 968 (1924) casts doubt upon this highly apposite decision misreads the opinion in the later case. Relying on Mr. Justice Lurton's statement in *Haas* that "The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government," 216 U.S. at 479, 30 S.Ct. at 254, the United States in *Hammerschmidt* sought to bring within the statute a conspiracy to urge persons subject to the Selective Service Act to disobey it. In ruling that the indictment did not charge an offense within the statute, the Court narrowed the language just quoted from *Haas* but not the holding. Noting that in *Haas* the element of trickery was clear and the only issue was whether pecuniary loss

---

2. We see no error in the judge's having allowed the jury to find that Miss Parkhurst's assignation with Weiner in February 1966 was an overt act in pursuance of the general conspiracy charged in the indictment even though it antedated Weiner's first knowledge of the Georgia Pacific investigation. Past favors can constitute

consideration for action as much as the promise of future ones.

3. Although one count of the *Haas* indictment alleged that the conspiracy included the making of a false report, 216 U.S. at 478–479, 30 S.Ct. at 249, the decision went far beyond that.

to the Government was also required, Chief Justice Taft explained, 265 U.S. at 188, 44 S.Ct. at 512:

> To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.

Despite academic criticism, see A. Goldstein, Conspiracy to Defraud the United States, 68 Yale L.J. 405 (1959), the Court has shown no disposition to recede from that view. In United States v. Johnson, 383 U.S. 169, 172, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), the Court thought it clear that *Haas* would cover the case of a Congressman's acceptance of money for the use of his influence in endeavoring to induce the Department of Justice to dismiss mail fraud indictments, although no pecuniary loss to the United States would result from such action and the defendants "were not charged with 'any false statement, misrepresentation or deceit,'" see Dennis v. United States, 384 U.S. 855, 861 n. 5, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). That the receipt of consideration likewise is not essential is shown by the statement in Dennis v. United States, *supra*, 384 U.S. at 860–861, 86 S.Ct. 1840, at 1844 (1966), that a conspiracy to obtain the services of the NLRB by filing false non-Communist affidavits came within 18 U.S.C. § 371. An agreement whereby a federal employee will act to promote private benefit in breach of his duty thus comes within the statute if the proper functioning of the Government is significantly affected thereby.

It scarcely needs argument that the high repute and effective functioning of the SEC—conspicuous for its zeal in preventing the misuse of inside information, see, e.g., Cady, Roberts & Co., 40 SEC 907 (1961); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)—would be significantly compromised by arrangements whereby an individual could obtain information about its impending action from one of its employees and profit from having such knowledge before this became available to the public generally.[4] Public confidence essential to the effective functioning of government would be seriously impaired by any arrangement that would enable a few individuals to profit from advance knowledge of governmental action. The very making of a plan whereby a government employee will divulge material information which he knows he should not is "dishonest" within Chief Justice Taft's language in *Hammerschmidt*,[5] regardless of whether such plan is secured by consideration.

## II.

If this opinion had been written prior to June 23, 1969, it could have stopped at this point. Peltz' sentences on the two § 10(b) and the § 10(a) counts were concurrent with the sentence on the conspiracy count, and we see no likelihood that submission of the latter would have had a prejudicial "spill-over" on the conspiracy conviction. See United States v. Hines, 256 F.2d 561, 562–563 (2 Cir. 1958). While we do not pretend to un-

4. In thus noting the peculiar irony of the use of inside information of impending SEC action, we do not mean at all to limit our holding to that agency. Similar considerations would apply in many other instances that readily come to mind. Arrangements to obtain advance information with respect to rate decisions of the ICC, FPC, FCC, and CAB, of merger decisions of the ICC; of the issuance of television licenses by the FCC or airline certificates by the CAB, or of the approval or dis-approval of foods or drugs by the FDA, are only a few examples. An arrangement with the secretary or law clerk of a federal judge to secure advance information with respect to a decision having implications for the stock market would be another.

5. See also the statement in *Hammerschmidt* that the words "to defraud" "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching," 265 U.S. at 188, 44 S.Ct. at 512.

derstand exactly where Benton v. Maryland, 395 U.S. 784, 788–791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), leaves the "concurrent sentence doctrine," see United States v. Febre, 425 F.2d 107, 113–114 (2 Cir. 1970), the question is so obscure and the issues with respect to the §§ 10(b) and 10(a) counts are sufficiently likely to recur that we think it best to consider Peltz' attacks on these convictions.

■ Section 32(a) of the Securities Exchange Act, discussed in more detail in Part III of this opinion, makes criminal any willful violation of any provision of the act or any rule or regulation thereunder the violation of which is made unlawful. Section 10(b) of the Act and the Commission's Rule 10b–5 thereunder, both too familiar to warrant quotation, admittedly qualify under this test. The Government's submission was that by Peltz' assertions to Loeb, Rhoades & Co. and to Bache & Co. with respect to ownership of the stock of Georgia Pacific whose sale he directed, he willfully and knowingly made untrue statements of material facts and engaged in acts that would operate as a fraud or deceit in connection with the sale of a security.

Prima facie this would seem entirely clear. The immediate consequence of the lies was that the brokerage houses did not demand the 70% collateral required by the then applicable regulation of the Federal Reserve Board, 12 C.F.R. § 220.3, for short sales. As a result the firms were exposed to risk of serious loss when, as turned out to be the case, Peltz did not deliver the stock on the normal settlement date. Also, as we shall see, the lies caused the brokerage

firms to violate § 10(a) and Rule 10a-1 relating to the price at which short sales can lawfully be made. Even though these violations of the margin and short sale rules were unwitting, the brokers were subject to possible disciplinary proceedings by the New York Stock Exchange. Despite the caveat in SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 192 n. 40, 84 S.Ct. 275, 11 L.Ed. 2d 237 (1963), we see no more reason for requiring proof of actual (as distinguished from potential) injury in a criminal prosecution than in a suit for an injunction in a securities fraud case.

■ Indeed, Peltz does not so contend. His position is rather that there can be no criminal liability for violations of § 10(b) and Rule 10b–5 "where the fraud was not related to the investment value of securities." Recognizing our decision in A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2 Cir. 1967), that the placing of purchase orders with the intent to pay only if the securities had appreciated by the settlement date gave rise to civil liability under the statute and the rule, he argues that the same words must have a narrower application in criminal prosecutions. We are not convinced of this, Herlands, Criminal Aspects of the Securities Exchange Act of 1934, 21 Va.L. Rev. 139, 162 (1934), nor do we believe that Peltz' formulation would be appropriate if any narrowing were to be done. Short selling without compliance with the margin and short sale price rules can have a materially larger adverse effect on the public than a seller's hoodwinking a buyer into an unfortunate purchase of a few hundred shares.[6]

---

6. With respect to the issue whether Peltz in fact lied to Loeb, Rhoades & Co. concerning his mother's owning the 2,000 shares he directed to be sold, Peltz here complains for the first time that the prosecutor commented on her presence in court and the defense's failure to call her and argued that the most reasonable inference was that her testimony would not have been favorable. He similarly complains that the judge told the jury it might infer that her testimony would have been unfavorable to the Government or to the defendant or to both, or might draw no inference at all, and that, in its deliberations about this, it might take the relationship into account. While such objection comes much too late, the comment was fair argument, and the charge was right, United States v. Beekman, 155 F.2d 580, 584 (2 Cir. 1946); Felice v. Long Island R. R. Co., 426 F.2d 192, 194–195 (2 Cir. 1970).

### III.

Section 10(a) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly, by the use * * * of any facility of any national securities exchange" to effect a short sale of any security registered on a national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary in the public interest or for the protection of investors. The Commission's Rule 10a-1(a), sometimes called the "down-tick" rule, provides:

No person shall, for his own account or for the account of any other person, effect on a national securities exchange a short sale of any security (1) below the price at which the last sale thereof, regular way, was effected on such exchange, or (2) at such price unless such price is above the next preceding different price at which a sale of such security, regular way, was effected on such exchange * * *.

The Government established that Rule 10a-1(a) had been violated in the case of 1700 of the 3000 Georgia Pacific shares Peltz ordered to be sold on April 7, 1966.

■ Peltz' first contention, that the statute and rule apply only to brokers and dealers, requires little discussion. The statute speaks of "any person" and the intention to go beyond the "person" actually arranging the trade is made manifest by the phrase "directly or indirectly." The rule is even clearer in covering the person for whose account the sale is made as well as the person making it. See United States v. Mandel, 296 F.Supp. 1038, 1040 (S.D.N.Y. 1969). We thus would have no doubt that a customer explicitly instructing a broker to make a short sale in contravention of Rule 10a-1(a) would be as much subject to criminal liability as the broker who carried out the instruction.

■ However, there was no evidence that Peltz gave any such instruction and we must confront the issue whether a customer "willfully" violates Rule 10a-1(a) when he deliberately makes a false statement to a broker that he owns securities directed to be sold and there is a resulting violation of the rule, because the broker, having no reason to think that the rule was applicable, failed to take the precautions that would prevent such a violation. In considering this question it will be helpful to have the full text of § 32(a) of the Securities Exchange Act before us:

Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 15 of this title, which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both, except that when such person is an exchange, a fine not exceeding $500,000 may be imposed; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

The language makes one point entirely clear. A person can willfully violate an SEC rule even if he does not know of its existence. This conclusion follows from the difference between the standard for violation of the statute or a rule or regulation, to wit, "willfully," and that for false or misleading statements, namely, "willfully and knowingly." It follows also from the proviso whereby lack of knowledge of a rule or regulation pre-

vents imprisonment but not a fine.[7] All this was pointed out in a penetrating article written by the late Judge Herlands many years before his appointment to the federal bench, Criminal Law Aspects of the Securities Exchange Act of 1934, *supra*, 21 Va.L.Rev. at 148–149.

Decision that the Government need not prove knowledge of Rule 10a-1(a)[8] in order to establish criminal liability still leaves the question what mental state it must prove. The Herlands article concluded it was necessary only that "the prosecution establishes a realization on the defendant's part that he was doing a wrongful act," 21 Va.L.Rev. at 149. We accept this with the qualifications, doubtless intended by the author, that the act be wrongful under the securities laws and that the knowingly wrongful act involve a significant risk of effecting the violation that has occurred. See A.L. I. Model Penal Code, § 2.03 (1962); Study Draft of a New Federal Criminal Code, § 305 (1970).

On this analysis the court was clearly justified in submitting the § 10(a) counts to the jury under proper instructions. There was ample evidence that Peltz was aware "he was doing a wrongful act," namely, telling the brokers he was long when he knew he was not. His false statements, negating the facts that would have induced the brokers to take the requisite steps to avoid a violation of 10a-1(a), created a serious risk that such a violation would occur, as it did. Cf. Pereira v. United States, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

The conviction on all four counts is affirmed.

---

7. Peltz made no effort to bring himself within this proviso.

8. Horwitz testified that on at least three occasions Peltz called him to ask "whether or not selling stock without labelling it a short sale was crime; whether it had to be done on an up tick or not." However, these calls appear to have been some weeks after the sales of April 7. Although "the subsequent existence of a fact supports the inference of its earlier existence, when the subsequent condition is one which ordinarily would not exist unless it had also existed at the earlier time," United States v. Consolidated Laundries Corp., 291 F.2d 563, 569 (2 Cir. 1961), citing 2 Wigmore, Evidence (3rd ed.) 413–14, we are not at all sure that the inference here would be sufficiently strong to support a conviction if the Government was required to prove knowledge of the regulation beyond a reasonable doubt. Peltz' inquiries may well have stemmed from his concern arising from an FBI investigation.