**UNITED STATES of America,**

v.

**John J. CASSESE, Defendant.**

**No. 03 CR.302 RWS.**

United States District Court,
S.D. New York.

Nov. 13, 2003.

Honorable James B. Comey, United States Attorney for the Southern District of New York, New York, NY, By: Deirdre A. McEvoy, Ausa, Steven R. Glaser, Ausa, of counsel.

Latham & Watkins, New York, NY, By: David M. Brodsky, Alexandra A.E. Shapiro, Noreen A. Kelly–Najah, for Defendant, of counsel.

## OPINION

SWEET, District Judge.

Defendant John J. Cassese ("Cassese") has moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29(c), along with a conditional grant of a new trial pursuant to Rule 29(d), and, in the alternative, for a new trial pursuant to Rule 33. As set forth below, Cassese is granted a judgment of acquittal and conditionally granted a new trial.

### Prior Proceedings

On February 25, 2002, the SEC filed a complaint against Cassese for insider trading in Data Processing Resources Corporation ("DPRC") securities. Neither admitting nor denying any of the allegations against him, Cassese consented to the entry of a Final Judgment of Permanent Injunction and Other Relief (the "Consent Order") in the civil enforcement action against him. In the Consent Order, Cassese agreed to pay disgorgement in the amount of $150,937.50, plus prejudgment interest of $19,512.84, and to pay a civil penalty in the amount of $150,937.50.

Cassese was subsequently criminally indicted in March 2003 and charged with two counts of insider trading. On July 23, 2003, the count predicated on Section 10(b) (Count Two) was dismissed because Cassese owed no fiduciary duty to Peter Karmanos ("Karmanos")[1] or his company, Compuware. *United States v. Cassese*, 273 F. Supp.2d 481, 486–88 (S.D.N.Y.2003). The remaining count of the Indictment

1. Karmanos is the Chief Executive Officer and Chairman of Compuware.

(Count One) charged Cassese with violating Section 14(e) and Rule 14e–3.

Two jury trials were held. The first trial, which began on September 15, 2003 and lasted six days, resulted in a mistrial after the jury was unable to reach a unanimous verdict. The second trial commenced on September 29, 2003, and after a four day trial, the jury rendered a guilty verdict.[2]

After the close of the government's case-in-chief in the first trial, Cassese moved for a judgment of acquittal pursuant to Rule 29, arguing that a criminal prosecution under Rule 14e–3 required the government to establish as separate elements of the crime that Cassese knew the Compuware–DPRC merger would take the form of a tender offer and that substantial steps had been taken in furtherance of that tender offer; and that the government failed to produce any evidence of such knowledge. This motion was denied.

In the first trial, upon further questioning from the jury,[3] the jury was instructed that the law did "not require the government to prove that the defendant had knowledge of a tender offer." However, they could consider Cassese's "knowledge, or lack of knowledge, of a tender offer with respect to the issue of [his] intent and willfulness." (First Trial Court Ex. 9.)

In the second trial, after the government rested, Cassese again moved for a judgment of acquittal pursuant to Rule 29. He moved on two grounds, incorporating by reference the arguments advanced in his Rule 29 motion from the first trial and arguing in the alternative that all of the evidence offered to establish his intent was circumstantial and consistent with his innocence, or at most, equally supported inferences of innocence and guilt. This motion was denied without prejudice to a later motion for a judgment notwithstanding the verdict.

At 4:35 p.m. on its only day of deliberations, the jury asked to hear certain testimony of Barry Goldsmith ("Goldsmith"), the investment banker who worked on the Compuware/DPRC deal. The testimony related to Computer Horizons' interest in acquiring DPRC in 1998, about a year before the stock trades at issue took place. At 4:55 p.m., after hearing this testimony, the jury rendered a verdict of guilty. After the verdict, Cassese renewed his Rule 29 motion.

Cassese's instant motion was marked fully submitted on November 7, 2003. Cassese claims that he should be granted a judgment of acquittal because the evidence was insufficient as a matter of law to establish that he acted with criminal intent. In the alternative, he argues that a new trial is necessary because the verdict was against the weight of the evidence; the last jury note showed it relied on evidence that could not reasonably be interpreted to support Cassese's guilt; and Cassese was unfairly prejudiced by the government's arguments regarding an "anger theory," which has no evidentiary basis.

### Facts Established by Proceeding

The testimony and exhibits offered during the second trial established the following facts:

---

**2.** Cassese was convicted on Count One of the Indictment after less than three hours of deliberation by the jury.

**3.** The jury sent a note to the Court, asking "Are you able to instruct the jury whether John Cassese had to be told or find out directly that there was going to be a tender offer or may the jury use possession of other material information to connect the defendant with knowledge of a tender offer for DPRC?" (First Trial Ex. 8.)

Cassese was the Chairman and President of Computer Horizons Corporation, a New York corporation with its principal place of business in Mountain Lakes, New Jersey. Cassese founded Computer Horizons in 1969. By 1999, when it was in its 27th year as a public company, it had grown to $515 million in revenue. It had 4,800 employees globally, 800 clients, and 50 offices worldwide.

In April 1999, Computer Horizons and Compuware entered into discussions about a possible business combination. There was a single meeting between executives of Compuware and Computer Horizons on April 12, 1999, which resulted in a proposal by Compuware to purchase Computer Horizons. This offer took the form of a letter of intent ("Letter of Intent") that attached a proposed confidentiality agreement ("Proposed Confidentiality Agreement"). Goldsmith, Compuware's investment banker, forwarded the Letter of Intent and Proposed Confidentiality Agreement to Computer Horizons on May 4, 1999.

The Letter of Intent offered Computer Horizons $22.50/share for all outstanding shares. According to the Letter of Intent, this transaction would take place through either a tender offer or cash merger. The Board of Directors of Computer Horizons rejected Compuware's offer as too low. Sometime towards the end of May 1999, Goldsmith called Cassese and told him that Compuware had decided not to acquire Computer Horizons at that time.

At the same time that Compuware made its initial contact with Computer Horizons, it also contacted DPRC about the possibility of a merger. The parties met in April and May of 1999, and by the beginning of June, the DPRC Board of Directors had approved a merger with Compuware. On June 17, 2003, Goldsmith asked the Chief Executive Officer of Compuware, Karmanos, to call Cassese to tell him that Compuware was going to buy another company, but that it might be interested in buying Computer Horizons in the future. Karmanos had not been involved in his company's negotiations with Computer Horizons and was not even aware that an offer had been made to Computer Horizons until over a year after this phone call.

On June 21, 1999, Karmanos spoke with Cassese, whom he had never met, for the first and only time on a four-minute phone call. During that call, Karmanos told Cassese that (1) Compuware would not be doing a deal with Computer Horizons at that time, but might be interested in purchasing it in the future; and (2) that Compuware was going to announce a deal with DPRC instead. Karmanos did not tell Cassese any details about the deal.

On June 22, 1999, Cassese purchased 15,000 shares of DPRC stock in two brokerage accounts in his own name, in which he regularly made unsolicited purchases of stock. At approximately 9:30 a.m. that day, Cassese called his Morgan Stanley broker, Joseph Moschella ("Moschella") (a friend of his sons) to buy shares of DPRC. Moschella was not there. Cassese then called Michael Pizzutello ("Pizzutello"), his Merrill Lynch broker, and placed an order for 10,000 shares of DPRC. When Moschella called Cassese back a few minutes later, he placed an order with him for an additional 5,000 shares of DPRC. To cover the purchase price of the DPRC stock, Cassese asked Moschella to liquidate a position in IKON, with respect to which he made a substantial profit.

Moschella and Pizzutello testified that Cassese did not seem nervous or excited when he called them; he bought a normal number of shares and used an ordinary amount of money; and, as was common for Cassese and other clients, he bought shares first thing in the morning before his

business day began. Moschella also testified that it was common for Cassese to liquidate a position in one stock to buy another. Both brokers testified that Cassese had made much larger purchases of stock in the past with respect both to the number of shares and purchase price. Cassese had further purchased DPRC stock before; in an account he maintained at Robert W. Baird & Co., Inc., Cassese previously purchased 1,500 shares of DPRC in November 1996 and another 500 shares of DPRC in March 1997, and sold all 2,000 shares in June 1997. Cassese never asked the brokers to monitor DPRC stock and never called in to check on the price or status of the stock.

On June 24, 1999, at 8:43 a.m., Compuware announced that it would make a tender offer for all of the outstanding shares of DPRC at $24.00/share. Moschella saw the news of the tender offer that morning and called Cassese to tell him about it, but was unable to reach him. Moschella eventually spoke with Cassese at approximately 1:45 p.m. and informed him of the merger announcement and the current trading price of the stock. Cassese seemed surprised to learn of the announcement and asked Moschella to sell the DPRC shares. Cassese made a profit of approximately $49,000 on this sale.

Approximately twenty minutes later, Cassese called Donald Pizzutello ("Mr.Pizzutello"), Michael Pizzutello's father and partner, and asked him to sell the DPRC shares held in his Merrill Lynch account. Cassese made a profit of almost $100,000 on these transactions. During a subsequent telephone conversation with Mr. Pizzutello, Cassese asked him if he could cancel the trades, and Mr. Pizzutello told him that the trades could not be undone. However, when interviewed by FBI agents several years later, Mr. Pizzutello did not remember Cassese asking him to cancel the trades. Upon being advised of this interview by Mr. Pizzutello, Cassese refreshed his recollection and asked him to call the FBI back and set the record straight on that point, which is what Mr. Pizzutello did.

## I. Cassese's Rule 29(c) Motion is Granted

### A. Cassese's Rule 29(c) Motion

Cassese claims that the evidence is insufficient to establish that he acted with the requisite criminal intent for two reasons. First, he argues that the government presented no evidence from which the jury reasonably could have inferred that he knew or should have known that the Comuware/DPRC deal was a tender offer, and "in the unique context *of this case,*" Cassese could not have believed his conduct was unlawful without such knowledge. (Cassese's Mem. at 11 (emphasis in original).) Second, he argues that "even assuming" he could be convicted regardless of his lack of knowledge that a tender offer was involved, "the evidence that the government claimed was proof that Mr. Cassese acted willfully actually showed his innocence; or, at worst, equally supported inferences of innocence and guilt and thus created reasonable doubt as a matter of law." *Id.*

### B. The Rule 29(c) Standard

Where "there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt" on "each and every element of the charged offense," a judgment of acquittal is required pursuant to Rule 29. *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984) (internal quotations and citations omitted). "[W]here a fact to be proved is also an element of the offense [such as intent] it is not enough that the inferences in the government's favor are permissible. [The

court] must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.1995) (reviewing the sufficiency of evidence of defendant's intent to distribute a controlled substance); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994) ("[A] conviction based on speculation and surmise alone cannot stand.... [T]he government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt.").

### C. The Mens Rea Requirement Under Rule 14e–3

Rule 14e–3 states in pertinent part:

If any person has taken a substantial step or steps to commence, or has commenced a tender offer ..., it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information *relating to such tender offer* which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from [an inside source] ...

17 C.F.R. 240.14e–3 (emphasis added).

The *mens rea* requirement for the tender offer and that substantial steps have been taken to commence it raises a difficult question that has not yet been ruled upon by the Second Circuit. This is an especially difficult case because unlike the conduct involved in the overwhelming majority of insider trading cases, Cassese's purchase of stock did not violate Section 10(b).[4] Where a defendant is charged with violations of both Section 10(b) and Rule 14e–3, the willfulness requirement under Section 32(a) for both charges is simultaneously satisfied by proof of intent to violate Section 10(b)'s general prohibition against trading on inside information that the defendant acquired in the context of a fiduciary duty. In such cases, the proof for the state of mind of the more general Section 10(b) charge can satisfy the state of mind requirement for the Rule 14e–3 charge as well.

### 1. Knowledge of a Tender Offer Is Not an Element of Rule 14e–3

■ However, the Second Circuit has upheld district court decisions where the jury was instructed that there is no *mens rea* requirement with regards to the "tender offer element" of Rule 14e–3. For instance in *United States v. Chestman*, 88 Cr. 455(JMW) (S.D.N.Y.), the jury charge (at 907) started:

It is not necessary that you find that the defendant knew what substantial steps had been taken. It is enough that you find one or more substantial steps were in fact taken.... It is not necessary that the defendant knew that the information related to a tender offer, as long as the information did, in fact, relate to a tender offer.

*See also United States v. Flanagan*, 95 Cr. 105(JSM) (S.D.N.Y. Sept. 21, 1995); *United States v. Ballesteros Gutierrez*, 01 Cr.

---

**4.** Cassese indicates that "[i]n the more than two decades since the SEC promulgated Rule 14e–3," he is aware of only one other criminal case that alleged a violation of Rule 14e–3, but not section 10(b). (Cassese's Mem. at 12 n. 3) (*citing United States v. Falbo*, No. 92 Cr. 0763 (S.D.N.Y.1992).) Furthermore, in that case, "the defendant not only knew that the transaction would be a tender offer, but also breached a fiduciary duty to obtain the information." *Id.* (*citing SEC v. Falbo*, 14 F.Supp.2d 508, 522–23, 525 (S.D.N.Y.1998)).

258(LAK) (S.D.N.Y. Feb. 25, 2002); *United States v. Robles*, 00 Cr. 1169(RMB) (S.D.N.Y. Sept. 30, 2002) (jury instructions not requiring the jury to find that defendant was aware that the information related to a tender offer or that the parties had taken substantial steps to commence a tender offer).

The Second Circuit upheld this decision in *United States v. Chestman*, 947 F.2d 551 (2d Cir.1991) (*en banc*). In the due process section of the opinion, the Second Circuit stated:

> Chestman next argues that his Rule 14e–3(a) convictions violate due process because he did not have fair notice that his conduct was criminal. Given the explicit language of Rule 14e–3(a), we also reject this claim.... Rule 14e–3(a) explicitly proscribes trading on the basis of material nonpublic information derived from insider sources. Unlike Rule 10b–5, Rule 14e–3(a) is not a general, catchall provision. It targets specific conduct arising in a unique contexttender offers. The language of the rule gave Chestman, a sophisticated stockbroker, fair notice that the conduct in which he engaged was criminal.

*Id.* at 563–64. *See also SEC v. Warde*, 151 F.3d 42, 47–48 (2d Cir.1998); *SEC v. Mayhew*, 121 F.3d 44, 49 (2d Cir.1997) (affirming convictions where there was no evidence that the defendant knew that the impending transaction was being structured as a tender offer).

The Eighth Circuit dealt with this issue in *United States v. O'Hagan*, 139 F.3d 641 (8th Cir.1998), concluding that Rule 14e–3 does not require that a defendant know that substantial steps toward a tender offer have been taken. The court stated:

> Rule 14e–3(a) requires that 'any person' must have taken a substantial step or steps' towards the tender offer. The rule does not require the defendant to have knowledge of these acts. Instead, the defendant need only 'know or have reason to know' that the material information is 'nonpublic and has been acquired directly or indirectly from' the tender offeror in some way.

*O'Hagan*, 139 F.3d at 650. However, the court declined to decide whether the due process clause in the criminal context "requires the court to read into Rule 14e–3(a) a requirement that [defendant] had knowledge of the substantial step or steps taken prior to the tender offer" since this claim was raised in the first time in defendant's brief to the Supreme court and had not been preserved. *Id.* Thus, holding that knowledge of substantial steps was not an element of Rule 14e–3, the court declined to decide what *mens rea*, if any, due process required in order to find culpability.

In the civil context, the First Circuit held in *SEC v. Sargent*, 229 F.3d 68, 79 (1st Cir.2000), that "Rule 14e–3 does not require that a person charged with violating the rule have knowledge that the nonpublic information in his possession relates to a tender offer." *Id.* The court reasoned that "[t]here is simply no language in the Rule indicating that a defendant must know that the nonpublic information in his possession relates to a tender offer." *Id.* at 78. The court further pointed to the accompanying release to the SEC's promulgation of Rule 14e–3, which explained that "[f]or the first two requisites, i.e., materiality and relation to a tender offer, there is no 'knows or has reason to know' standard." *Id.* at 79 (quoting Tender Offers, Exchange Act Release No. 17120, 1980 WL 20869, at *6 (Sept. 4, 1980)).

■ Based on these authorities, knowledge of a tender offer is not an element of Rule 14e–3.

### 2. Criminal Liability Requires that a Defendant Act Willfully, or with a Realization of Wrongful Conduct, Under Section 32(a)

However, according to section 32(a) of the Securities Exchange Act, "willfully" is the requisite *mens rea* for criminal liability under Rule 24e–3. 15 U.S.C. § 78ff(a). The Second Circuit interpreted "willfully" in this context in *United States v. Peltz,* 433 F.2d 48 (2d Cir.1970). The Second Circuit drew a distinction between "willfully" and "knowingly," explaining:

> A person can willfully violate an SEC rule even if he does not know of its existence. This conclusion follows from the difference between the standard for violation of the statute or a rule or regulation, to wit, "willfully," and that for false or misleading statements, namely, "willfully and knowingly." It follows also from the proviso whereby lack of knowledge of a rule or regulation prevents imprisonment but not a fine.

*Id.* at 54; *see also United States v. Dixon,* 536 F.2d 1388, 1397 (2d Cir.1976) ("[T]he contrast between the first and second clauses [of § 32(a) of the Securities Exchange Act] and the clear inference that a person may be convicted (although not imprisoned) for violating a rule of whose existence he is unaware shows that 'willful' has less than its ordinary significance in prosecutions for violation of the first clause; and that the requirement would be satisfied by the lesser showing outlined in *Peltz.*").

■ The Second Circuit then defined willfully as "a realization on the defendant's part that he was doing a wrongful act" under the securities laws and "that the knowingly wrongful act involved a sig-

nificant risk of effecting the violation that has occurred." *Peltz,* 433 F.2d at 55. *See also Metromedia Co. v. Fugazy,* 983 F.2d 350, 364 (2d Cir.1992) (same). Thus, willfulness requires a *"realization"* of wrongful conduct under the securities laws involving *"a significant risk* of effecting" a violation.

### 3. Cassese Must Have Believed that the Information Related To, or Most Likely Related To, a Tender Offer

Based on these authorities, knowledge of a tender offer or substantial steps is not a requirement for liability under Rule 14e–3 in either criminal or civil cases. However, for there to be criminal liability, a defendant must have a "realization" of wrongful conduct under the securities laws (*Peltz,* 433 F.2d at 55), and "[g]ood faith on the part of the defendant is a defense to a charge of securities fraud" (Cassese Jury Charge at 12). As the Cassese jury charge instructed, "If the defendant acted at all relevant times in good faith and held an honest belief that his actions were proper and not in furtherance of any illegal venture, it is your duty to acquit him." *Id.* "Willfully" entails "the intent to do something that the law forbids," and it refers to action taken "with a bad purpose to disobey and disregard the law." *Id.* Thus, the government does not have to prove the defendant's knowledge of the tender offer, but it does have to prove Cassese's belief that he committed an illegal act. Since there is "no general duty to refrain from trading on material nonpublic information," the defendant must have believed that the information related to, or most likely related to, a tender offer in order to impose criminal liability. *Id.*[5]

---

5. The Supreme Court has "recognized that the mental element in criminal law encompasses more than the two possibilities of 'spe-cific' and 'general' intent ... The Model Penal code, for instance, recognizes four mental states—purpose, knowledge, recklessness, and

To conclude otherwise would impose absolute liability for all who trade on material nonpublic information, and this is not the law. The Williams Act and Rule 14e–3 are concerned only with tender offers. As the Second Circuit explained in *Chestman*, "Unlike Rule 10b–5, Rule 14e–3(a) is not a general, catchall provision. It targets specific conduct arising in a unique contextt-ender offers." *Chestman*, 947 F.2d at 564.

▮ Moreover, as repeatedly held by the Supreme Court, "the requirement of some *mens rea* for a crime is firmly embedded" and "the existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence." *Staples v. United States*, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (*citing United States v. United States Gypsum Co.*, 438 U.S. 422, 436–37, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)); *see also Morissette v. United States*, 342 U.S. 246, 259, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a

consequent ability and duty of the normal individual to choose between good and evil."). Thus, "offenses that require no *mens rea* generally are disfavored" and "some indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime." *Staples*, 511 U.S. at 606, 114 S.Ct. 1793. Dispensing with the *mens rea* requirement is particularly inappropriate where, as here, such an interpretation would "criminalize a broad range of apparently innocent conduct."[6] *Liparota v. United States*, 471 U.S. 419, 426, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). If Congress intended to prohibit all trading on material nonpublic information, it could have easily done so. *See id.* at 427, 105 S.Ct. 2084 (pointing out in the food stamp context that "Congress *could* have intended that [a] broad range of conduct be made illegal" and acted accordingly).

The government appears to view this as a case to further a "trade at your peril" standard. (10/2/03 Tr. at 453:25.) In its closing argument, the government stated, "Trade at your peril, because you can be violating the securities law when you trade on material nonpublic information."

negligence." *Liparota v. United States*, 471 U.S. 419, 423, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) (*citing* ALI, Model Penal Code § 2.02). With regards to its holding in *United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), the Supreme Court further noted, "although the Court held that the Government did not have to prove actual knowledge of federal agency jurisdiction, the Court explicitly reserved the question whether some culpability was necessary with respect even to the jurisdictional element." *Liparota*, 471 U.S. at 431, 105 S.Ct. 2084 (*citing Yermian*, 468 U.S. at 75 n. 14, 104 S.Ct. 2936). In the *Yermian* case, the jury was given a "reasonable-foreseeability" standard and instructed without objection from the prosecution that the government must prove that respondent "knew or should have known" that his false

statements were made within the jurisdiction of a federal agency. *Id.*

**6.** In oral argument, Cassese's counsel pointed to the following absurd result:

> [O]ne can imagine a scenario wherein somebody who wasn't within the ambit of 10b received material non-public information about a deal he was told would be a cash merger. The person a couple days later goes and buys the stock. Unbeknownst to him, the parties have decided instead to do a tender offer. All of a sudden he's guilty of a crime even if he knew about the rule and deliberately thought about [it] and said to himself, I'm not violating the rule because they told me it's a cash merger and not a tender offer.

(9/17/03 Tr. at 407).

(10/2/03 Tr. at 453:25–454:2.) [7] The government later referred to the tender offer element in this case as "a smoke screen" (10/2/03 Tr. at 503) and "irrelevant" (10/2/03 Tr. at 515).[8]

### D. The Evidence is Insufficient to Establish that Cassese Acted with the Requisite Mens Rea

■ In this case, there is no direct evidence that Cassese possessed information about the form of the Compuware and DPRC transaction. If Cassese possessed no information from which he could reasonably conclude that a tender offer was more or less likely, the evidence is insufficient as a matter of law to establish that Cassese had the requisite culpability.

Cassese had spoken to the relevant Compware executives, Eliot Stark ("Stark") [9] and Karmanos, on only one occasion each. Stark specifically testified that he never told Cassese that Compuware intended to acquire DPRC or that

the DPRC deal would be a tender offer. Similarly, Karmanos testified that when he spoke to Cassese on June 21, 1999, he did not tell him that the DPRC transaction would be a tender offer,[10] nor did he provide any other details about the transaction. Goldsmith also testified that he never told Cassese that Compuware intended to acquire DPRC and never told him that such a deal would take the form of a tender offer.

The remaining evidence offered by the government to establish Cassese's criminal intent, even when "viewed in the light most favorable to the prosecution," at most provides "equal or nearly equal circumstantial support" for the competing inferences of innocence and guilt. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (*quoting United States v. Lopez*, 74 F.3d 575, 577 (5th Cir.1996)). As the Second Circuit explained, in such a case "a reasonable jury must necessarily entertain reasonable doubt," mandating acquittal. *Id.*

---

7. *See also* 9/17/03 Tr. at 414:

   The Court: Bottom line, you view is that it is a *per se* statute if you have inside information, and if it turns out that there is a tender offer.

   Ms. McEvoy: That's correct, you Honor, or substantial steps towards a tender offer. [Counsel for the government]

8. The government correctly stated, "There is no requirement that Mr. Cassese knew there was a tender offer," but then went on to claim, "This was just a smoke screen ... to distract you from the evidence." (10/2/03 Tr. at 503.) Similarly, the government declared, "And the government did not mean to suggest to you in any way that Mr. Karmanos told Mr. Cassese that it was a tender offer. That point ... is irrelevant. Under this statute, under this charge, the government does not need to prove that Mr. Cassese knew it was a tender offer.... It's irrelevant." (10/2 Tr. at 515.) It is true that knowledge of a tender offer is not a requisite for liability, but this does not

render the tender offer element "a smoke screen" or "irrelevant." Rather, the government must show that Cassese believed he was violating the law, and he would not have the requisite belief unless he believed there would likely be a tender offer.

9. Stark is the former executive vice-president for finance responsible for mergers and acquisitions at Compuware.

10. This is notwithstanding the government's slip to the contrary in its closing argument (10/2/03 Tr. at 446) ("[Y]ou know from the conversation between John Cassese and Peter Karmanos on June 21, 1999, that Peter Karmanos provided certain information, told him that the DPRC tender offer was going to occur ..."), which necessitated an instruction from the Court (10/2/03 Tr at 467). This slip is particularly egregious coming at the heels of a warning concerning the same misstatement in government's summation in the previous trial. (9/18/03 Tr. at 616–20.)

### 1. Cassese's Use of Two Brokerage Accounts

The government argues that the fact that Cassese bought the DPRC shares in two accounts, first in his Merrill Lynch account and then in his Morgan Stanley account, was an attempt to avoid detection by law enforcement. The government contends that Cassese chose to break the stock purchases up in two accounts so that he would be buying the stock in small blocks that would escape the attention of the regulators. The government claims that it was suspicious that Cassese bought a second tranche of 5,000 shares in the Morgan Stanley account, because he had enough cash in his Merrill Lynch account to buy all 15,000 shares and had to liquidate his position in IKON in his Morgan Stanley account to free up cash to buy the DPRC shares.

However, Cassese's purchase of DPRC in two accounts could have easily been the result of random circumstances. On the morning of June 21, 1999, Cassese called Moschella to place an order in his Morgan Stanley account but did not reach him. Cassese then called Pizzutello and placed an order for 10,000 shares of DPRC with his firm instead. When Moschella returned his call, Cassese decided to purchase an additional 5,000 shares and liquidated his IKON position to do so. Moschella was a friend of his sons, and Cassese could realize a substantial profit on the IKON investment. It is thus reasonable to conclude that Cassese decided to realize his IKON profit before it dissipated, while giving his sons' friend a commission. Furthermore, according to the evidence, it was typical of Cassese's investing pattern for him to hold the same stock in more than one brokerage account.

Moreover, Cassese's purchase of DPRC in two accounts only made his trades more conspicuous, doubling the paper trail. If Cassese acted with a bad purpose to violate the law, he would have tried to conceal his trades rather than making them so obvious. Purchases of 10,000 and 5,000 share blocks are large by any standard, and it is not reasonable to believe that they would avoid detection, while buying a 15,000 share block would stand out. Cassese previously bought much larger amounts in both accounts so his brokers would not have found anything odd if he had bought all the shares in one account. Furthermore, the NASD investigator, the government's witness, testified that every single trade, no matter how small, can be easily found on the computer system.[11]

### 2. The Timing of the DPRC Purchase

The government also argues that the jury could infer that Cassese acted willfully because he bought the DPRC stock on June 22, 1999, at 9:30 a.m., the day after the Karmanos call. However, if Cassese believed it legal to buy the stock, he would have had no reason to wait to make the purchase. Cassese purchased the DPRC stock the day after the Karmanos call, in his ordinary way—in the morning, in his own accounts, in normal amounts.

---

11. The government further points out that the NASD investigator testified that trades are tracked through inquiry reports, which record individual stock purchases by brokerage firm, not by customer. The government then argues that by placing trades at separate brokerage firms, Cassese could make it appear as if two different customers had made those pur- chases. However, this argument is unavailing since there is no evidence that Cassese possessed this detailed knowledge into the manner in which the NASD tracks securities trades. Furthermore, Cassese traded in both accounts under his own name, knowing that each would generate a paper trail leading up to him.

Cassese has further owned DPRC stock before, and it is possible to perceive his purchase of DPRC stock as simply a way of keeping abreast of the competition's developments and progress.

### 3. *Cassese's Desire to Cancel the Trades*

■ The government additionally points to Cassese's desire to cancel the trades as indicative of his culpable intent. However, Cassese's desire to cancel the trades provides no evidence of his intent at the time he made the trades. It reflects his attitude on the day he sold, not bought the stock. After the fact "consciousness of guilt evidence" is insufficient as matter of law to sustain a conviction. *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir.1975) (evidence of consciousness of guilt is "insufficient proof on which to convict where other evidence of guilt is weak and evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt."); *see also Glenn*, 312 F.3d at 69 ("Although false exculpatory statements to law enforcement officials may be circumstantial evidence of consciousness of guilt and may strengthen inferences supplied by other pieces of evidence, they do no alone prove guilt."); *United States v. King*, No. 94 Cr. 455, 1997 WL 43617, at *14 (S.D.N.Y. Feb.4, 1997) (holding that concealment of insurance payment after completion of an alleged fraudulent scheme was "evidence only of consciousness of guilt, not of guilt"); *United States v. Ramirez*, 894 F.2d 565, 571 (2d Cir.1990) (evidence of flight can be considered as consciousness of guilt, but such evidence standing alone is insufficient to establish guilt); *United States v. Scheibel*, 870 F.2d 818, 822 (2d Cir.1989) (defendant's fabrication of exculpatory evidence may be considered as an indication of con-

sciousness of guilt, but "cannot be the sole basis for a conviction").

As recognized, "feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt." *Miller v. United States*, 320 F.2d 767, 773 (D.C.Cir.1963). *See also* L. Sand, et al., *Modern Federal Jury Instruction*, Instr. 6–10 (while evidence that defendant used a false name may suggest consciousness of guilt, it is not sufficient alone to prove guilt); Instr. 6–12 (same regarding consciousness of guilt from fabrication of alibi); Instr. 6–13 (same regarding consciousness of guilt from disguised handwriting); Instr. 6–14 (same regarding consciousness of guilt from falsification of evidence). Thus, Cassese's attempt to cancel the trades, even if viewed as after the fact consciousness of guilt, is insufficient by itself to sustain a conviction.

Furthermore, Mr. Pizzutello testified that it was Cassese who reminded him to tell the FBI that he sought to cancel his trades. This does not reflect a guilty conscience as Cassese did not seek to hide the circumstances of his trade. Rather, it is more consistent with a belief by Cassese that he did nothing wrong and knowledge of all the relevant facts would clear him.

### 4. *Cassese's Conversation with Goldsmith*

The government further points to Goldsmith's testimony about a conversation he had with Cassese over two months after the trades as indicative of Cassese's intent at the time of the DPRC transaction. Goldsmith testified that "in words or substance" Cassese told him he had made "a stupid mistake." (Tr. 378–79.) Goldsmith testified that he could not recall the specifics of the conversation and only had "a vague recollection" of his "impression" and "take-away." (Tr. 208.) Goldsmith's testimony thus amounts to no more than that

Cassese regretted buying the DPRC stock, which is not surprising given the amount of trouble it had caused him. Goldsmith, however, did specifically recall that Cassese never said that he felt he had done something "wrong." (Tr. 208.)

Goldsmith's testimony further provided the sole support for the government's theory that Cassese was angry that Compuware chose not to buy Computer Horizons and that this "anger caused a man who might not otherwise have been disposed to violate the securities laws to do so on this occasion, and did so knowingly and intentionally." (Tr. 379.) Thus, according to the government, motivated by anger, Cassese willfully committed securities fraud. However, as the jury was instructed, "[t]he securities laws do not prohibit people from purchasing stock when they are angry. It is not a crime to buy stock when upset." Furthermore, Goldsmith was not even certain as to what if anything Cassese was upset about. (Tr. 209.)

### 5. *The May 4, 1999 Letter of Intent*

The May 4 Letter of Intent, offered by the government, is not probative of Cassese's state of mind with respect to the DPRC transaction. This document has nothing to do with DPRC and was sent to Computer Horizons approximately seven weeks before Karmanos' phone call regarding the Compuware/DPRC deal. Furthermore, it contains no evidence that Compuware intended to adopt a tender offer as its exclusive method of merger, despite never having used one before. Rather, the Letter of Intent states that Compuware would offer to buy Computer Horizons by tender offer or cash merger.

Moreover, there is no evidence that Cassese gave any consideration to the form of the merger. Goldsmith, the only

witness who spoke to Cassese about the document, testified that Cassese was mainly focused on the offered price per share and that he would have left the form of the transaction to his general counsel and outside lawyers, as was his practice.

### 6. *The Proposed Confidentiality Agreement*

Likewise, the Proposed Confidentiality Agreement has no probative value with respect to Cassese's intent because there is no evidence that Cassese ever reviewed the document or had any reason to review it since negotiations never progressed past the issue of price.[12] Goldsmith and Cassese never discussed this agreement, and as Goldsmith testified, Cassese would typically not read such agreements, leaving these sorts of details for his general counsel and outside lawyers to take care of. Moreover, Cassese never signed the Proposed Confidentiality Agreement, and there are no markings on it. All of the handwriting and other markings on Computer Horizon's version of the document appear on the Letter of Intent and fax cover page.

Even if Cassese had read the document, he still could have reasonably concluded that any duty to keep discussions confidential was not implicated by the gratuitous sharing of information, related to negotiations in which he and his company had no involvement.

### 7. *Cassese's Personal Knowledge of Securities Law*

Besides relying on Paragraph 8 of the Proposed Confidentiality Agreement, the government further cites Cassese's experience as a CEO for the inference that he would have "an understand-ing of the securities laws." (Tr. 380–81.) As the gov-

---

12. The limiting instruction with regards to this Proposed Confidentiality Agreement is that the jury should only consider it if it is shown that "Mr. Cassese read the document."

ernment points out, Cassese was the Chief Executive Officer for 27 years of a publicly-traded company that routinely made securities filings. Although the government's evidence establishes that Cassese was familiar to some degree with certain aspects of securities law, there is no evidence that Cassese's company ever participated in a tender offer or had occasion to deal with Section 14(e) or Rule 14e–3. However, as the jury was charged, "Mr. Cassese need not have known that he was breaking any particular law or any particular rule. He need only have been aware of the unlawful nature of his acts." (Jury Charge at 13 (*citing Peltz,* 433 F.2d at 54).)

In any case, the possession of knowledge of the securities laws could be perfectly consistent with Cassese's innocence. Cassese could have believed that he was entitled to trade on Karmanos' information since it did not relate to his company's stock, he was not an insider to the deal, he did not owe any duty to Karmanos or Compuware, and he had no reason to believe that the form of the transaction would be a tender offer.

### 8. *The Government's Evidence in its Totality*

■ It is further necessary to view the evidence "in its totality and in the light most favorable to the Government" in considering whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Glenn,* 312 F.3d at 69 (*quoting Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). However, if all the evidence "viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.' "

*Glenn,* 312 F.3d at 70 (*quoting Lopez,* 74 F.3d at 577). *See also United States v. Martinez–Sandoval,* No. 01 Cr. 307, 2003 WL 1442454, at \*6 (S.D.N.Y. Mar.6, 2003) (granting defendant's Rule 29 motion because "[t]he circumstantial evidence regarding Defendant's specific intent to join the [illegal narcotics] conspiracy ... equally supports competing theories of guilt and innocence"); *United States v. Harris,* 942 F.2d 1125, 1130 (7th Cir.1991) (reversing defendant's convictions for willfully evading tax obligations because the "bare facts" are "as consistent with an inference of innocence as one of guilt").

This is the case here where even when taken together, all the government's evidence of Cassese's culpability—that Cassese purchased DPRC shares in two brokerage accounts, the timing of his purchase, his desire to cancel the trades, his conversation with Goldsmith, the May 4 Letter of Intent, the Proposed Confidentiality Agreement, and his personal knowledge of securities law—give at most "equal circumstantial support" to competing explanations of Cassese's intent. *Glenn,* 312 F.3d at 70. The government's evidence thus fails to establish Cassese's guilt beyond a reasonable doubt.

### II. *Cassese's Rule 29(d) Motion*

Cassese is further conditionally granted a new trial pursuant to Rule 29(d)(1). Fed.R.Crim.P. 29(d)(1) states, "If the court enters a judgment for acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." A new trial is appropriate since:

(1) there is insufficient evidence supporting Cassese's criminal intent;

(2) the jury reached its verdict 20 minutes after being read background

testimony, irrelevant to the issue of Cassese's guilt; and

(3) evidence regarding Cassese's "anger motive" was inappropriately submitted.

The government's anger-motive theory was unsupported by the evidence, yet resulted in the introduction of irrelevant and highly prejudicial evidence regarding Cassese's wealth. As explained above, Goldsmith's testimony provided the sole support for the government's anger theory, and Goldsmith was not even certain as to what if anything Cassese was upset about. (Tr. 209.) The government was thus unable to establish Cassese's anger and to connect any disappointment about the failed negotiations between Compuware and Computer Horizons, which ended in May 1999, to Cassese's bad purpose to violate the securities laws on June 2, 1999.[13]

However, this theory enabled the introduction of highly prejudicial and inflammatory evidence and arguments in front of the jury regarding Cassese's wealth, salary, and stock holdings. This evidence played into a bias against people of wealth. In contrast to what may have been alleged, any potential benefits Cassese stood to gain from a Compuware/Computer Horizons transaction stemmed from typical change of control provisions in his contract, bearing no indication of his greed or other personal characteristics.

### III. *Cassese's Rule 33' Motion is Moot*

As Cassese's Rule 29 motion is granted, it is unnecessary to rule on his Rule 33 motion for a new trial in the interest of justice.

### *Conclusion*

Cassese's Rule 29(c) and (d) motions are thereby granted, and his Rule 33 motion is denied as moot.

It is so ordered.

---

**13.** Furthermore, there are certain logical holes in this anger theory. As the defense points out, it makes no sense for Cassese to risk everything to make what was for him a small amount of money (the gain from the DPRC transaction amounted to less than 1% of what he allegedly missed out on when the Compuware/ Computer Horizons deal fell through). Moreover, Compuware expressly left open the possibility of a future deal with Computer Horizons. Keeping this option open and maintaining good relations was the whole reason for Karmanos' fateful phone call.